UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

SERGEY YANCHUKOV,                          ECF CASE

             Plaintiff,                     CASE NO. _____

    v.

MAXIM FINSKIY

           Defendant.
---------------------------------------------------------X


## **COMPLAINT**


BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0208
Tel: (212) 885-5000
Fax: (212) 885-5001

*Attorneys for Plaintiff*

Date: October 15, 2015

## <u>TABLE OF CONTENTS</u>

OVERVIEW .................................................................................................................. 1

PARTIES TO THE ACTION ........................................................................................ 2

CORPORATE STRUCTURE OF WHITE TIGER .................................................... 3

JURISDICTION AND VENUE .................................................................................... 4

BASIS FOR ALLEGATIONS ...................................................................................... 5

   I.    Finskiy's Investments in Century and White Tiger ......................................... 5

   II.   White Tiger's Poor Financial Situation ........................................................... 8

     A.  Default under Deutsche Bank Gold Forwarding Facility and Loss of Century's Mines. 8

     B.  Fraudulent Obtainment and Misappropriation of VTB Funding ..................... 9

   III.  Finskiy Begins Divesting His Interest in White Tiger .................................. 13

   IV.  Finskiy's Misrepresentations and Yanchukov's Investments ...................... 13

     A.  Yanchukov's Initial Investments into White Tiger ...................................... 14

     B.  Finskiy Begins to Reel In Yanchukov ......................................................... 15

     C.  Finskiy Convinces Yanchukov to Buy Him Out ......................................... 21

     D.  Yanchukov's Discoveries of Finskiy's Wrongdoing ................................... 23

   V.   Yanchukov's Actions Against Finskiy .......................................................... 25

COUNTS ...................................................................................................................... 26

   I.    Count I (Violations of RICO, 18 U.S.C. § 1962(c)) ...................................... 26

     A.  The RICO Enterprise ..................................................................................... 26

     B.  Pattern of Racketeering Activity ................................................................... 28

       1.   Wire Fraud in Violation of 18 U.S.C. § 1343 ........................................ 28

       2.   Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in Violation of 18 U.S.C. § 2314 ........................... 31

       3.   Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. § 2315 ............... 32

     C.  Nature of Pattern of Racketeering ................................................................ 32

     D.  Injuries to Yanchukov .................................................................................... 32

   II.   Count II (RICO Conspiracy, 18 U.S.C. § 1962(d)) ...................................... 33

   III.  Count III (Fraud) ............................................................................................ 34

   IV.  Count IV (Civil Conspiracy to Commit Fraud) ........................................... 36

   V.   Count V (Unjust Enrichment) ........................................................................ 37

DEMAND FOR JUDGMENT AND RELIEF ............................................................ 38

Plaintiff Sergey Yanchukov, by and through his undersigned attorneys, for his claims and causes of action against Defendant Maxim Finskiy, alleges and avers as follows:

## OVERVIEW

1.      This action is premised upon a scheme planned and executed by Defendant Maxim Finskiy, personally and via companies he controlled – Kirkland Intertrade Corporation ("Kirkland"), DZM Gold Mining Ltd. ("DZM"), WTG Holdings S.A.R.L. ("WTG Holdings") and Inger Industries ("Inger") – in which Finskiy and the companies, through a series of fraudulent misrepresentations and omissions, caused Yanchukov, his companies and various banks, to loan significant funds to, and Yanchukov to ultimately purchase through his companies, White Tiger Gold, Ltd. ("White Tiger"), resulting in considerable losses to Yanchukov.

2.      White Tiger was a gold producer with properties held through subsidiaries in Peru, Quebec and Russia.   During the relevant time period, Finskiy was the Executive Chairman of, and controlled, White Tiger.   Unique Goals International, Ltd. ("Unique Goals") and Faith Union Industries, Ltd. ("Faith Union"), are both registered in the British Virgin Islands and beneficially owned by Yanchukov.  Through his entities, Yanchukov provided a series of loans to, and made significant investments in, White Tiger beginning in 2011 and 2012, based upon false representations by Finskiy regarding the profitability of White Tiger.   Finskiy made these fraudulent representations after realizing that his own substantial investments in White Tiger were in peril.

3.      Beginning no later than 2010, acting in concert with his companies, associates and managers, Finskiy devised a scheme to divest himself of White Tiger and avoid suffering substantial personal losses by fraudulently inducing Yanchukov to acquire control of White Tiger. Finskiy pursued this scheme while acting in concert with his various managers and associates.

1

Ultimately, Finskiy convinced Yanchukov, and various banks, to heavily invest in White Tiger, by knowingly feeding them false information and withholding other material information, while at the same time Finskiy worked to divest himself of his interests in White Tiger and Century (the "Gold Mining Scheme").

4.      Through these activities, Finskiy, in conjunction with his companies Kirkland, DZM, WTG Holdings and Inger, as well as his managers and associates, committed numerous acts of wire fraud and interstate transportation of stolen property in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961.  Finskiy's conduct also gives rise to various New York state common law claims.

5.      In March 2013, Yanchukov, through Unique Goals and Faith Union, and as a result of Finskiy's fraudulent scheme, acquired substantial shareholdings in White Tiger from companies owned and controlled by Finskiy and his business partner, Oleg Baibakov, and became White Tiger's beneficial owner.

6.      Yanchukov subsequently discovered that Finskiy deliberately misrepresented and withheld material information regarding the viability of White Tiger and its gold mine reserves.

7.      As a result, Yanchukov brings this action to recompense his losses.

## PARTIES TO THE ACTION

8.      Sergey Yanchukov is the owner of Faith Union and Unique Goals.  Through Unique Goals and Faith Union, he beneficially owns or has control over 338,300,208 shares of Mangazeya Mining Limited, formerly known as White Tiger.  He is the current CEO and a Board member of Mangazeya, and sits on Mangazeya's Corporate Governance and Compensation Committee.

9.      Maxim Finskiy is a businessman with years of experience in leading Russian and global mining companies.  Previously, Finskiy was the majority owner, Executive Chairman and Director

of White Tiger.  Finskiy is currently a majority owner and a Director in a publicly listed mining company Red Tiger Mining.  From 2008 to 2010, Finskiy was also the President of Intergeo Mining and Metals Company, the mining and exploration arm of the private Russian conglomerate Onexim Group, which is Russia's largest investment fund with $25 billion in assets.  From 1998 to 2001 Finskiy acted as First Vice Chairman of the Bank MFK, a part of Onexim Group. From 2001 to 2008 Finskiy worked as Deputy Managing Director of OAO GMK "Norilsk Nickel", one of the largest Russian metal mining and production companies, which was partly controlled by the beneficiary of the Onexim Group.

## CORPORATE STRUCTURE OF WHITE TIGER

10.     White Tiger Gold, Limited ("White Tiger"), a British Virgin Islands company, was publicly listed on the Toronto stock exchange (TSX), and owned gold mining properties in Russia, Canada and Peru.  White Tiger owned gold mine properties by way of ownership in Diascia Investment Ltd. ("Diascia Investments"), registered in Cyprus and Diascia Holding BVI Ltd. ("Diascia Holdings"), which in turn owned shareholdings in the following Russian subsidiaries: Dalsvemet LLC, Ildikangold LLC, Koryakmining LLC, Vostokmet LLC, Kalartsvetmet LLC and Geozvetmet LLC, each of which owned separate properties.  Dalsvemet owns the Nasedkino licensed area in Russia, Ildikangold (currently, Mangazeya Mining LLC) owns the Savkino mine in Russia, Koryakmining owns the Zolinsko-Arkiinskaya licensed area, and Geozvetmet owns the Pridneprov licensed area.  In October 2011, White Tiger amalgamated with Century Mining Corporation.

11.     Century Mining Corporation ("Century"), a company incorporated in Ontario, Canada, owned gold mining facilities in Lamaque, Quebec, and a San Juan mine in Peru.  Century

combined with White Tiger in an amalgamation on October 20, 2011, becoming a subsidiary of White Tiger.

12.     In March 2013, White Tiger was taken under the control of Yanchukov and its name was later changed to Mangazeya Mining Ltd. ("Mangazeya").   Approximately 30% of Mangazeya Mining Ltd shares are publicly traded on the stock exchange NEX in Toronto.

<u>**JURISDICTION AND VENUE**</u>

13.     This action arises under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and the common law of New York.

14.     Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, and 1367 and 18 U.S.C. § 1961, *et seq.*  Yanchukov's state law claims arise out of the same case or controversy as the federal law claims, and all claims in this action arise out of a common nucleus of operative facts.

15.     The exercise of personal jurisdiction over Finskiy is reasonable and proper in this district because: (a) Finskiy resided and/or maintained an apartment in New York throughout the Relevant Period (2011 through 2013); and (b) Finskiy has conducted substantial and not isolated activity with New York throughout the Relevant Period, including maintaining an apartment in New York, owning a vehicle with a New York title, holding bank accounts in New York, paying taxes in New York, and directing many of the fraudulent activities described in this Complaint from New York. Personal jurisdiction is further proper under 18 U.S.C. § 1965(a) because Finskiy resided in New York and transacted his affairs there throughout the Relevant Period.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and Finskiy has agents in this district and transacts his affairs here.

## BASIS FOR ALLEGATIONS

17.     The factual allegations in this Complaint are based on an international investigation by counsel and other professionals into the facts and circumstances alleged herein, including, without limitation, review and analysis of: documents, emails, subscription agreements, memoranda, loan agreements, management reports, press releases, Ontario Securities Commission filings, and other relevant documentation.

**I.     Finskiy's Investments in Century and White Tiger**

18.     Beginning in approximately 2009, Finskiy identified White Tiger as a promising business opportunity and began to make a series of substantial direct and indirect investments in White Tiger.  Eventually his investments totaled in the tens of millions of dollars, allowing Finskiy to assume complete dominion and control over White Tiger and its operations.

19.     In September 2009, Finskiy, through Kirkland, first invested in Century, obtaining 7,142,857 Century shares for Cdn $20 million in a private placement.  The money from this purchase was to be used to develop Century's Lamaque gold mine in Quebec.

20.     On December 24, 2009, Finskiy purchased an additional 20,000,000 shares of Century, and on December 30, 2009, another 78,750,000 shares, investing $3,200,000 and $15,750,000 in each respective transaction.

21.     On January 13, 2010 three members of the Century's Board of Directors resigned (Ross Burns, Ricardo Campoy and Allen Ambrose) and two new directors were named – Fran Scola and W. Lamarque, both representing Finskiy.  Keith Hulley, another representative of Finskiy, was appointed to act as an advisor to the Board and later became interim CEO.  These changes to the board structure allowed Finskiy to assume control of Century.

22.     On December 13, 2010, White Tiger indirectly acquired, through Diascia Investments and Diascia Holdings, a 100% interest in Ildikangold, Dalsvetmet, Koryakmining, and Vostokzvetmet, four wholly-owned mining subsidiaries of LLC UK Dalsvetmet, a company wholly-owned directly and indirectly by Finskiy.  Four days later, on December 17, 2010, White Tiger purchased an 80% interest in Geozvetmet, another LLC UK Dalsvetmet subsidiary, in exchange for 85,000,000 common shares of White Tiger.  The result of this transaction was that Finskiy acquired 94.7% of White Tiger's issued and outstanding shares.

23.     On February 8, 2011, White Tiger loaned Century $800,000.

24.     On February 15, 2011, the International Company for Finance and Investment ("Bank MFK"), with which Finskiy had close relations, entered into loan facilities with White Tiger's subsidiaries, Ildikangold and Dalsvetmet for 450,000,000 and 250,000,000 rubles respectively.

25.     On March 11, 2011, White Tiger agreed to advance up to a further $3,200,000 to Century.

26.     On March 14, 2011, White Tiger announced its intent to merge with Century.

27.     On March 24, 2011, Century announced that it received an additional $1,500,000 tranche of funding from White Tiger.

28.     On June 13, 2011, Finskiy provided Century with $1,000,000 as a working capital loan for the Lamaque mine project.

29.     On August 30, 2011, Ildikangold entered into loan facility with Sberbank for 300,000,000 million rubles.

30.     On September 27, 2011, White Tiger and Century entered into a credit facility agreement, pursuant to which, White Tiger agreed to fund Century's expansion plans through 2011, up to $10,000,000.

31.    On October 20, 2011, White Tiger and Century formally merged.  Pursuant to the amalgamation, a subsidiary of White Tiger acquired all of the issued and outstanding common shares of Century.

32.    On December 16, 2011, White Tiger, through Ildikangold and LLC WTG Management, acquired a 100% interest in Kalarsvetmet for $2,000,000 from DZM, a company controlled by Finskiy.

33.    On March 21, 2012, Diascia Investments, as sole participant of Dalsvetmet and Ildikangold, passed board resolutions to lend $40,000,000 to each company.  Diascia Investments received the money from VTB Capital Plc under a Facility Agreement dated March 7, 2012.

34.    In the spring of 2012, Finskiy arranged for White Tiger to receive bridging loans, including $2 million from Kirkland on March 27, 2012, and another $1,000,000 on April 5, 2012.

35.    On May 14, 2012, White Tiger received a $1 million loan directly from Finskiy.

36.    On June 13, 2012, Kirkland loaned White Tiger another $2,500,000.

37.    On July 5, 2012, White Tiger announced a proposed private placement.

38.    Under the first tranche of the private placement, on July 16, 2012, Kirkland acquired 55,830,500 shares in White Tiger for Cdn $5,583,050, which amount was offset by Kirkland's $2,500,000 loan to White Tiger on June 13, 2012.

39.    As a result of the foregoing, by the middle of 2012, Finskiy had over $62,000,000 invested in White Tiger.  Rather than prove to be a successful venture, White Tiger soon began to falter, putting Finskiy at risk of losing a sizeable portion of his personal wealth.  Upon information and belief, seeking to avoid a disastrous result, Finskiy embarked on an orchestrated effort to separate from White Tiger by having his loans repaid or converting the loans into equity that could be easily

liquidated.  In the end, through a series of fraudulently induced transactions, Finskiy was able to

unload his interests upon Yanchukov, an unwitting victim of Finskiy's criminal enterprise.

II.     **White Tiger's Poor Financial Situation**

      A.     **Default under Deutsche Bank Gold Forwarding Facility and Loss of Century's Mines**

40.     When Finskiy first began investing in White Tiger and Century and thought the company

had a bright future, he took steps to obtain additional operating capital in the form of loans to

facilitate the expansion of Century's mining operations.  Century, however, was never able to

perform to expectations or meet its obligations under the loan agreements, putting Finskiy's

investment at risk.

41.     On December 22, 2009, Century executed a $33,000,000 prepaid gold forwarding facility

with Deutsche Bank, pursuant to which Century agreed to deliver 61,183 ounces of gold to

Deutsche Bank over five years in exchange for a $33,000,000 loan.

42.     On June 30, 2011, Century announced that a technical report on the Lamaque mine issued

by Micon International Limited, showed a 75% drop in measured and indicated resources and a

59% drop in reserves from those estimated in a 2009 technical report.

43.     On July 25, 2011, Century entered into an amended and restated Deutsche Bank loan to

amend Century's gold delivery obligations in light of anemic production at Lamaque.

44.     On September 8, 2011, Century announced a second amended and restated Deutsche

Bank loan to again address Century's gold delivery obligations.

45.     Due to a continuous default under the Deutsche Bank gold forwarding facility, on

December 2, 2011, Deutsche Bank entered into a limited and conditional waiver in relation to the

gold shortfall.

46.     By March 2012, Century was again in default of its obligations to Deutsche Bank.

47.     On May 21, 2012, Century advised Deutsche Bank that it faced an imminent cash flow shortage and, absent additional financing, it would not be able to deliver the Scheduled Monthly Gold Quantity for May 2012 and would not be able to meet obligations going forward.

48.     Just two days later, on May 23, 2012, Deutsche Bank was advised that White Tiger would not finance Century's operations past May 25, 2012, a decision that was, upon information and belief, controlled by Finskiy.

49.     As a result, on May 25, 2012, White Tiger announced that Deutsche Bank would be taking control of Century and its mines in Peru and Quebec due to Century's continuous default under the gold forwarding facility.

50.     On or about May 28, 2012, the Century mines were seized by a receiver on behalf of Deutsche Bank and shut down.

51.     In addition to Century's overall poor performance, the loss of the Lamaque and Peru mines placed Finskiy's investment in the combined White Tiger, as well as his personal financial position, in significant jeopardy.  Following the loss of the Lamaque mine, White Tiger had only one currently operating gold mine, the Savkino mine in Russia.  As a result, Finskiy was forced to further leverage White Tiger's few remaining assets in a desperate effort to salvage his investment in White Tiger.

**B.      Fraudulent Obtainment and Misappropriation of VTB Funding**

52.     Knowing that White Tiger was in financial distress, Finskiy, upon information and belief, orchestrated a new funding facility with VTB Capital Plc ("VTB") by misrepresenting the future prospects of the company.  Finskiy, however, never intended to use the VTB facility to benefit the operations of White Tiger.  Rather, realizing that White Tiger was a lost cause and that the VTB

funding would not improve the prospects of the combined company, Finskiy misappropriated the VTB funding for his own purposes, and for the benefit of his other entities.

53.     In July 2010, Daltsvetmet, which ran the Nasedkino mine and was still a subsidiary of Finskiy's DZM at the time, began negotiations with VTB Capital to obtain an $80 million loan for purposes of bringing the Nasedkino mine into production.  By late 2010, Daltsvetmet and VTB had agreed to the basic terms and conditions of the loan, pledge and hedge agreement.

54.     In July 2011, upon coming to a principal agreement of amalgamation with Century, and given the need to obtain financing for the amalgamated company's projects, it was resolved to increase the proposed VTB loan amount to $150 million, of which $80 million was intended for the development of the Savkino and Nasedkino mines in Russia, and $70 million was intended for the development of Century's mines, which had not yet been lost to Deutsche Bank.

55.     Pursuant to the new agreement, VTB put conditions on the loan, including a requirement that White Tiger obtain feasibility studies of the Savkino and Nasedkino mines in Russia, which studies were to be completed before issuance of the loan.  Finskiy, however, was aware of a November 22, 2010 technical report on the mineral resources and reserves of the Savkino gold mine in Russia that had been issued by Micon International ("Micon").  The report indicated the Savkino mine had 113 koz of proved and probable gold reserves as of September 1, 2010, an amount too low to secure the VTB loan.

56.     Upon information and belief, in order to obtain the VTB funding, Finskiy decided to hire TOMS Engineering, LLC ("TOMS") to conduct the new feasibility study of Savkino, to fraudulently inflate the findings of a feasibility study conducted the prior year by Micon.  Finskiy was determined to suppress the adverse findings in the Micon report and to fabricate a report that would further his fraudulent scheme to divest himself of a losing investment in White Tiger.

10

57.     On October 19, 2011, Ildikangold entered into agreement with TOMS to prepare a more favorable report on the Savkino mine, on an extremely short turnaround, by November 15, 2011.

58.     On October 28, 2011, at the first post-Century merger board meeting of White Tiger, which was held in New York at the St. Regis Hotel with Yanchukov in attendance, Finskiy distributed presentation materials stating that the proven reserves for Savkino were, "at least 400 koz of extractable gold," despite the Micon report, and the fact that TOMS had not yet issued its report.

59.     A month and a half later, on December 13, 2011, TOMS issued its technical report on the Savkino mine's mineral resources and reserves.  The report indicated an increase in gold reserves from 113 thousand ounces in the Micon report issued just one year earlier, to 3.8 times that amount - 438.9 thousand ounces.  On January 4, 2012, the results of the TOMS Report on the Savkino mine were published in a press release.

60.     On or about February 2, 2012, VTB, believing that its conditions had been met by the TOMS report and a report on Nasedkino, formally entered into a $150 million loan facility with Diascia Investments.  The facility was divided up into three tranches: $40 million to fund exploration, $40 million for development, and $70 million for production activities.  The facilities contained guarantees from White Tiger, Diascia Investments, and White Tiger's five operating company subsidiaries.  On March 7, 2012, upon satisfaction of all covenants as set forth under the loan terms and conditions, VTB and Diascia Investments signed an Addendum to the Facility Agreement.

61.     On March 26, 2012, and again on March 29, 2012, the first tranche of the VTB facility was drawn down.  Rather than being used for the exploration and development of the Savkino and Nasedkino mines as provided in the agreement, Finskiy, upon information and belief, knowing that White Tiger could not correct the defaults under the Deutsche Bank facility and that the

Savkino reserves were vastly overstated, ensured that the funds were instead used to prop-up his other entities.  On March 29, 2010, Finskiy used the VTB facility to repay the loans made by Bank MFK and Sberbank to White Tiger's operating companies, Dalsvetmet and Ildikangold, despite the fact that these loans were not yet due and had lower interest rates than that under the VTB Facility, leaving Century in debt, but with no operating capital.  It total, about $25 million was transferred to Bank MFK (a part of Onexim Group) and $10 million to Sberbank. Both of those banks are significant players in the industry and Finskiy needed to preserve his relationships with the financial institutions to protect his other business ventures.

62.     On March 29, 2012, on the same day that Ildikangold and Dalsvetmet repaid the loans to Bank MFK (a part of Onexim Group), Kirkland entered into a $30 million Loan Agreement with Onexim Group Management Limited (also a part of Onexim Group), which amount was transferred to Kirkland that day.   Thus, upon information and belief, the VTB funding misappropriated to repay the MFK Bank loans went through the Onexim Group and was ultimately paid to Kirkland, which is controlled by Finskiy.  On February 26, 2013 Kirkland repaid $5 million to Onexim Group Management Limited; however, Kirkland remains in possession of approximately $25 million.

63.     On October 10, 2012, the second tranche of the VTB facility was drawn down by $19 million.  Under Finskiy's control, this funding was used to make payments to sham corporations and pay improper bonuses and loans to White Tiger executives, rather than its intended purpose of mine development.

64.     Perpetuating a worsening financial position, as a result of the improper loan repayments and other misappropriation of VTB funding, Dalsvetmet and Ildikangold were left without any working capital during the active production phase of 2012.   Starved of capital, the mines'

production results in 2012 were poor, leaving White Tiger unable to pay its current liabilities or invest in future production.

### III.   Finskiy Begins Divesting His Interest in White Tiger

65.   Recognizing his fraudulent shell game would eventually be exposed and White Tiger would collapse, upon information and belief, Finskiy accelerated his plan to extricate himself from White Tiger.

66.   On February 2, 2012, the date Diascia entered into the VTB loan facility, Finskiy began taking steps to pull out of White Tiger.  On that date, Finskiy sold 1,641,412 of his shares of White Tiger.

67.   On July 16, 2012, Kirkland acquired 55,830,500 shares in White Tiger for Cdn $5,583,050 under the first tranche of the Private Placement, which was offset by the $2,500,000 loan from June 13, 2012.  This was the first of several transactions in which Finskiy converted his loans to White Tiger into equity, which could more easily be sold to others.

68.   On October 16, 2012, then-White Tiger CEO James McBurney requested that Yanchukov and Finskiy each provide $5,250,000 million to White Tiger to avoid the delisting of the company on Canada's TSX.   Despite the fact that Yanchukov and Finskiy agreed to provide the funds by mid-March 2013, Finskiy refused to provide such financing and instead pushed Yanchukov to buy him out.

69.   On October 19, 2012, the April 5, 2012 and May 14, 2012 loans from Finskiy to White Tiger were converted into White Tiger shares pursuant to a Loan Conversion Agreement. Finskiy received 53,104,577 White Tiger shares at that time.

### IV.   Finskiy's Misrepresentations and Yanchukov's Investments

70.     Despite the above transactions, Finskiy had long-recognized his significant equity in White Tiger was in peril and his personal fortune in jeopardy.  As a result, Finskiy determined that he needed to quickly divest all of his interests in White Tiger to an unsuspecting victim, and he identified Yanchukov, a trusting friend who was already involved in the company, as his "mark." Ultimately, Finskiy divested his own interests in White Tiger by convincing his mark, Yanchukov, to buy him out, leaving Yanchukov holding the empty bag.

71.     Finskiy and Yanchukov first met in 2006 and became friends, often vacationing and engaging in recreational sporting activities together.  In 2010, Finskiy even asked Yanchukov to become Finskiy's child's godfather.  By that time, the two men were spending substantial amounts of time together with their families.

### A.     Yanchukov's Initial Investments into White Tiger

72.     Relying on the confidences he had developed, Finskiy represented to, and convinced, Yanchukov that he had considerable and successful experience in the mining industry in Russia and across the globe.

73.     In the fall of 2010, almost a year after Finskiy himself had invested in Century, Finskiy encouraged Yanchukov to invest in Century as a minority shareholder.  Despite information to the contrary, upon information and belief, Finskiy trumpeted his inside knowledge of Century, assuring Yanchukov that the company was poised to become highly profitable.   Upon information and belief, Finskiy sought Yanchukov's investment to raise money for Century and to increase his influence over Century's minority shareholders for the anticipated amalgamation with White Tiger.

74.     Relying on his friend's false statements, on September 14, 2010, Yanchukov, through Faith Union, entered into the first of three subscription agreements to purchase shares of Century, agreeing to purchase 12,820,513 shares for Cdn $5,000,000.07.

75.     From November 30, 2010 until November 7, 2011, Faith Union purchased additional Century shares from the market, spending $3,836,505,81.

76.     Later in March 2011, while on vacation with their families in the Maldives, Finskiy and Yanchukov discussed Century.  Finskiy reiterated his statements that Century was a good investment, spoke highly of the company's current operating position, and encouraged Yanchukov to deepen his involvement with Century.

77.     On April 4, 2011, in response to requests by Finskiy that Yanchukov support Century, Faith Union entered into its second subscription agreement with Century, agreeing to purchase 10,333,333 shares of Century.

78.     Following his successful effort to cause Yanchukov to make substantial investments in Century, Finskiy began to initiate his plan to transfer his substantial financial risk in White Tiger to Yanchukov.  The crux of Finskiy's plan was to incrementally cause Yanchukov to make additional investments in White Tiger under the false understanding that the investments were necessary to save White Tiger from a short term liquidity crisis.   Finskiy, however, upon information and belief, knew White Tiger was structurally flawed, and its collapse was only a matter of time.  Finskiy hid this information from Yanchukov and instead, continued to present Yanchukov with false information suggesting that White Tiger was fundamentally sound.

### B.     Finskiy Begins to Reel In Yanchukov

79.     On July 25, 2011, Century entered into the amended and restated Deutsche Bank loan to amend Century's gold delivery obligations in light of the low production at Lamaque.   On that

same day, Finskiy again asked Yanchukov to support Century, claiming that without his help, the company would be lost to Deutsche Bank.  Finskiy told Yanchukov that Century would be expanding its operations, and that he was optimistic about its future.  Finskiy made these statements despite knowing about the report on Lamaque, indicating that its reserves were substantially lower than previously believed and it would be unable to satisfy its obligations to Deutsche Bank.

80.     In reliance on Finskiy's representations, on August 18, 2011, Faith Union entered into its third subscription agreement with Century, purchasing 4,910,500 shares in Century for $982,100.  On September 14, 2011, Faith Union executed another subscription agreement to purchase 12,820,513 shares of Century for Cdn $5,000,000.07.

81.     On October 3, 2011, Yanchukov, through Faith Union, loaned White Tiger another $3,000,000, repayment of which was due on December 15, 2011.  By this time, upon information and belief, Finskiy had already determined to hire TOMS to inflate the Savkino reserves in the feasibility study due to VTB.

82.     Relying upon Finskiy's representations of profitability, on October 7, 2011, Yanchukov, through Faith Union, purchased shares in White Tiger and Century from several companies owned by or affiliated with Finskiy, namely Caninton Trading Ltd (Belize), Bryton Services Ltd (Belize), and Polar S.A. (Commonwealth of Dominica) for a total amount of  $4,842,451.36.

83.     On October 28, 2011, the first post-merger board meeting of White Tiger was held in New York at the St. Regis Hotel.  In attendance, among others, were Finskiy and Yanchukov.  During this meeting, White Tiger's financial status and ability to discharge its debts was discussed.  It was at this meeting that Finskiy distributed presentation materials indicating that the proven reserves for Savkino were "at least 400 koz of extractable gold," before the TOMS report had even been

completed.  In addition, a cash forecast prepared by White Tiger management, upon information and belief, at the direction of Finskiy, indicated that Lamaque's cash flow would steadily improve. At this meeting, Finskiy told Yanchukov that White Tiger needed a bridging loan to meet its obligations to Deutsche Bank and help develop Lamaque so that Deutsche Bank would not be able to take over the mines.  Finskiy represented that the loan could be repaid in January 2012 and that the company's long-term prospects were good.

84.     Based upon Finskiy's representations at the October 28, 2011 meeting, Unique Goals entered into an agreement to loan White Tiger $3,000,000 that very day.  The loan was to be repaid by April 27, 2012.  A little over a week later, on November 7, 2011, Unique Goals loaned White Tiger another $12,000,000.

85.     Around this time, Finskiy began telling Yanchukov that Century would be able to meet its gold delivery obligations, but that Deutsche Bank was aggressively demanding immediate repayment of its loan.  Upon information and belief, Finskiy knew this information to be false and that Century would not be able to service its commitments to Deutsche Bank.  As a result of Finskiy's fraudulent statements and assurances, on December 15, 2011, Faith Union agreed to extend its October 3, 2011 loan to White Tiger until February 1, 2012 so that White Tiger would have the liquidity necessary to satisfy Deutsche Bank.

86.     Despite these investments, in January 2012, Finskiy begged Yanchukov to further support White Tiger with additional investments and to help organize a large credit facility so that the company could expand.  To this end, on January 19, 2012, Finskiy emailed Yanchukov several monthly reports on the mining operations.  These reports, which painted a rosy picture of White Tiger's future, contained the inflated TOMS numbers for the Savkino mine, and indeed, suggested that the TOMS findings with respect to Savkino could be grounds for increasing reserves numbers

as to the Ildikan mine.  Contrary to the information provided to Yanchukov, upon information and belief, Finskiy knew that the funds would never be used to expand the company, that the company would never have the ability to repay the credit facility and that the TOMS findings were fictitious.

87.     On February 24, 2012, Sergey Chalykh (Finskiy's top manager) provided Evgeny Konstantinidi (Yanchukov's top manager) with various materials regarding White Tiger's February 2012 Board Meeting.  These materials contained the inflated reserve amounts for the Savkino mine, and indicated that the Savkino mine had met all of its key targets for mining and processing in 2011, despite production having been significantly lower than budgeted.  Upon information and belief, Finskiy knew this information was false.

88.     In February 25-27 2012, Konstantinidi travelled to Miami and, along with Sergey Tchetvertnykh (an external business adviser to Yanchukov), participated in meetings with Finskiy on behalf of Yanchukov with respect to another set of mining interests – Red Tiger Gold.  At dinner after this meeting, Finskiy and Francis Scola (a long time business partner of Finskiy, a shareholder, and a board member in Century, White Tiger and Red Tiger) told Yanchukov's representatives that White Tiger was doing well and was expected to produce 120 thousand ounces of gold during the year 2012.  Upon information and belief, Finskiy and Scola knew these statements were untrue and made them as part of the scheme to fraudulently secure additional investments from Yanchukov.

89.     One month later, on March 25, 2012, Yanchukov met with Finskiy at the St. Regis Hotel in New York to discuss the financing of White Tiger.  During this meeting, Finskiy asked Yanchukov to provide a short-term loan to White Tiger of $1.2 million.  Finskiy stated that the Russian part of the company (including the Savkino mine) was doing well, but that the Canadian piece (the Lamaque mine), needed money.  During this meeting, the two also discussed the

prolongation of Yanchukov's loans to White Tiger.  Upon information and belief, Finskiy was well aware at the time he made these statements that they were false and that the loss of the Lamaque mine to Deutsche Bank was inevitable.

90.     In response to, and in reliance on, the fraudulent statements at the March 25, 2012 meeting, Faith Union signed a bridge loan with Kirkland for $1,200,000.  The funds, however, were transferred to the bank account of White Tiger, not Kirkland.  On April 6, 2012 the loan was repaid from Kirkland's account.

91.     On April 26, 2012, Yanchukov, by way of Unique Goals, loaned another $3,000,000 to White Tiger for the purpose of refinancing the Lamaque mine, funding Lamaque to commercial production, and to support capital development at the Savkino mine.  In addition, Unique Goals' October 28, 2011 loan agreement with White Tiger was amended to extend its maturity date to May 15, 2012.  These investments were made in direct reliance on fraudulent statements and fictitious documents provided by Finskiy, showing that the Lamaque and Savkino mines were in strong financial condition.  In fact, Finskiy, upon information and belief, knew the mines lacked the reserves and production capabilities to survive, let alone meet their financial obligations.

92.     Subsequently, when the Unique Goals and Faith Union loans to White Tiger matured in May 2012, Finskiy prevailed upon Yanchukov to restructure the loans to provide White Tiger with additional time to grow before repayment.  In connection with these discussions, Finskiy provided Yanchukov with the weekly report and summary of Lamaque mine as of May 13, 2012, and a valuation of the Russian portion of White Tiger's holdings, the second of which indicated high extraction of gold for the years 2012 to 2014.  In reliance on these reports, Yanchukov restructured the loans as requested.  Upon information and belief, however, Finskiy knew that the information

19

he had provided to secure the restructuring was completely false and that the collapse of the mines was inevitable.

93.    The following month, Yanchukov visited Finskiy, upon information and belief, in New York, to discuss Yanchukov's investment in the company.  During that meeting, Finskiy assured Yanchukov and provided him with documentation showing that the companies were able to repay the VTB loan and would provide him with a return on investment in time.  Once again, upon information and belief, Finskiy knew these statements to be fraudulent, but was compelled to continue furthering his scheme to extract his investment in White Tiger by fraudulently inducing Yanchukov to continue infusing liquidity into a failing enterprise.

94.    In July 2012, Unique Goals entered into a subscription agreement, purchasing 25,377,500 shares of White Tiger in exchange for $2,537,750.  In addition, Unique Goals' loans to White Tiger were consolidated into a single loan of $20,429,602.74, and extended until January 31, 2015 so that White Tiger could successfully complete the 2012 production season.  Yanchukov agreed to these transactions in reliance on the falsehoods perpetrated by Finskiy and his assurances that White Tiger was a company with sound fundamentals, and only short term capital needs.

95.    In July 2012, Yanchukov sent a representative, S. Techetvertnykh, to inspect the Lamaque and Savkino mines to investigate a sharp decrease in the extraction of gold.   Soon thereafter, N. Bolshakov, the chief geologist of the operating activities of White Tiger, told several White Tiger executives, including Rinat Ismagilov, McBurney, and Geoffrey Cowley (a Director), who reported directly to Finskiy, that based upon a recent underground survey, there was a divergence between the amount of actual stored ore and that reflected in Savkino reporting.

96.     It was subsequently determined that the scale setting on a screening unit was set to overestimate the weight of ore by about 20%, with corresponding omissions and misrepresentations in geological and surveying reports that were supposed to provide independent verification of the amount ore.   Upon information and belief, Finskiy actively participated in the misleading setting of the scale or knew of this scheme.

97.     On September 27, 2012, a meeting of the White Tiger Board was held at the Mandarin Hotel in New York to discuss the company's financial situation, operations of the mines, and presentations made to investors, including Yanchukov.  During this meeting, Finskiy doubled down on his prior fraudulent statements and continued to tell Yanchukov that White Tiger was a sound investment, its gold reserves were sufficient, and the cash crunch was only temporary.

### C.     Finskiy Convinces Yanchukov to Buy Him Out

98.     In contrast to Finskiy's many statements to the contrary, by early 2013, White Tiger was in a dire situation.  It was facing a delisting review and had obtained significant funding from VTB on false pretenses, which was misappropriated rather than used for development of the mines. And, on January 11, 2013, White Tiger announced that it had produced 18,261 ounces of gold in 2012, which was insufficient to satisfy the gold sales covenant of the VTB facility.

99.     In January and February of 2013, Yanchukov and Finskiy met several times at White Tiger's Moscow offices.  During these meetings, Finskiy offered to allow Yanchukov to buy him and Baibakov out of White Tiger.  Upon information and belief, to sell Yanchukov on the idea, Finskiy repeatedly assured Yanchukov that the Savkino mine had 430,000 ounces in gold reserves (despite his knowledge that the TOMS report had been inflated), and that the Savkino alone would return all of Yanchukov's investments and generate enough profits to repay the outstanding VTB loan.  Trusting Finskiy's greater experience in the industry, Yanchukov took the offer seriously.

100.     On February 22, 2013, Unique Goals loaned another $125,000 to White Tiger at the express request and demand of McBurney, who represented that this was the only way to renegotiate with VTB after White Tiger's default on the facility at the end of 2012, due to insufficient gold production.   For the same reasons, Unique Goals loaned White Tiger another $500,000 on February 25, 2013, and $1,500,000 on March 4, 2013.

101.     In early January 2013, Yanchukov, through Unique Goals commissioned SRK Consulting to prepare reports on some of the company's mines, including Savkino (the "SRK Report").  The SRK report was issued in February 2013; it was short and based only on limited documentation Finskiy's managers provided, which SRK was unable to fully verify.  Finskiy's managers delayed the transfer of documents and information, which made SRK's task even more complicated.  SRK concluded, based on the limited documentation provided, among other things, that if White Tiger reduced its expenses, the company could turn things around based on the represented 438,900 ounces of gold reserves.  Based on the documentation and data provided by Finskiy's managers, Yanchukov's team built an economic model, which led to a preliminary conclusion that it was possible to turn the economic situation at White Tiger around.

102.     On January 28, 2013 Tchetvertnykh (an external business adviser to Yanchukov), sent the economic model to Finskiy, Scola and Mc Burney asking them to check and verify the calculations. On the same day, Scola replied that they would send their model soon, and in fact did so on January 29, 2013, by e-mail to Yanchukov and Finskiy.

103.     As of March 2013, the production at Savkino was extremely low. On March 11, 2013, Yanchukov, still considering Finskiy's offer, became a director of White Tiger so that he could be more involved in decisions affecting his investment.

104.     On March 20, 2013, because Finskiy had told him that VTB's seizure of White Tiger's assets was imminent, and indeed had withheld funding in order to create an exigency that would put additional pressure on Yanchukov, Yanchukov was deceived into taking immediate action, and, through Unique Goals, he agreed to buy Finskiy out of White Tiger.  In making this decision, Yanchukov relied upon his economists' conclusion that it was possible to reach profitability and receive a return on his investments, which conclusion was based upon Finskiy's false representations of the Savkino mine's reserves.

105.     On April 2, 2013, Unique Goals amended the terms of its March 4, 2013 bridging loan to White Tiger, increasing the loan amount to $12,500,000, with $2,300,000 advanced by a subsidiary of Unique Goals to Diascia Investments.

106.     On April 5, 2013, Yanchukov purchased Finskiy's shares in White Tiger.

107.     By April 9, 2013, Finskiy was relieved from his duties on the White Tiger Board, and Yanchukov became White Tiger's CEO, having dismissed McBurney.

**D.     Yanchukov's Discoveries of Finskiy's Wrongdoing**

108.     After Yanchukov purchased Finskiy's interests in White Tiger, a MEF report was commissioned to conduct a financial audit of White Tiger.  A new geological study from Micon was also commissioned soon after Yanchukov took over White Tiger.

109.     The MEF audit report was issued on June 25, 2013.  The report concluded that $30,000,000, which was documented as having been used for drilling work, had actually been misappropriated because the company that allegedly completed the work was registered only one month before it contracted to do the work, and then was placed in bankruptcy.  In addition, it was discovered that White Tiger's management team had been paid unreasonable bonuses despite the desperate economic situation of the company.

23

110.     Around this time, it was discovered that White Tiger's interest in Kalarsvetmet, which it had purchased from Finskiy's DZM, was worthless because Kalarsvetmet had little or no reserves.  As a result, White Tiger voluntarily canceled the Kalarsvetmet license.

111.     On August 14, 2013, Yanchukov, having been defrauded into making a significant investment in White Tiger, announced ongoing negotiations with VTB to obtain a waiver or amend the terms of the VTB facility in order to save the company.  Unable to negotiate new terms with VTB that would allow White Tiger to ever turn a profit because of Finskiy's mismanagement of White Tiger, on October 3, 2013, White Tiger, having just been renamed Mangazeya, was forced to buy out Diascia Investments' VTB debt for market value ($59 million) and was assigned VTB's rights as to that loan.

112.     In August 2013, White Tiger implemented a new operations team led by new COO and director Sergey Kashuba.  When the team went to Savkino mine and counted the piles of ore, it was discovered that the ore on site was only half of what White Tiger had reported.  The team also found that the mine had a life of only four more years, which would not provide enough ore production to pay back VTB's loan, let alone Yanchukov's investments.  Finally, a secret underground pipeline leading into the forest was discovered and determined to have been created to steal gold in liquid form from the Savkino mine.  Upon information and belief, Finskiy bribed the mining operations team not to report this theft.

113.     On October 19, 2013, Mangazeya issued 53,104,577 shares to Kirkland in satisfaction of its outstanding loans.

114.     In December 2013, Micon released its new technical report, which concluded that Savkino contained only 119 koz of extractable gold, rather than the 430 koz of gold Finskiy had represented and persuaded TOMS to report.

115.    After receiving this information, Yanchukov attempted to revise the terms of his purchase

of Finskiy's interest in White Tiger, but Finskiy refused to negotiate.

**V.      Yanchukov's Actions Against Finskiy**

116.    After Finskiy refused to peacefully resolve the parties' dispute by discussing a

renegotiation of Yanchukov's buyout, Yanchukov, in accordance with Russian law, made a

criminal complaint against Finskiy to the Russian law enforcement authorities alleging large-scale

fraud on April 14, 2014.  Thus, a criminal investigation of intended fraud committed on a large

scale was commenced under part 4, Article 159 of the Criminal Code of the Russian Federation.

117.    On March 20th 2015, the Tagansky Court of the City of Moscow placed Finskiy under

house arrest, and put an electronic tracking device on him.

118.    On April 7, 2015 Finskiy cut his electronic bracelet and fled Russia.  He was initially

caught and detained at the Belarus border for three days, bearing a fake Azerbaijan passport in

the name of Vladimir Mikhailovich Zaitsev.  Finskiy, however, ultimately fled again, and his

current whereabouts are unknown.

119.    As of April 8, 2015, Finskiy became a criminal wanted by Russian law enforcement

authorities, and on April 9, 2015, an international fugitive wanted by Interpol.  A Russian judge

issued a search warrant and order to arrest Finskiy.

120.    On July 31, 2015, Finskiy, Kirkland, DZM, WTG Holdings, and Inger filed suit against

Mangazeya, Faith Union and Unique Goals in the Eastern Caribbean Supreme Court in the

British Virgin Islands, seeking a <u>worldwide</u> anti-suit injunction in favor of Finskiy and

termination of the criminal charges in Russia.

## COUNTS

### I.     Count I (Violations of RICO, 18 U.S.C. § 1962(c))

121.    Yanchukov realleges and incorporates herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

122.    During the Relevant Period, each of Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Finskiy's managers and associates, was a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

### A.     The RICO Enterprise

123.    Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Finskiy's managers and associates are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the Gold Mining Scheme described herein, to obtain money and property from Yanchukov and various financial institutions by means of false or fraudulent pretenses and representations.   Specifically, the purpose of the Gold Mining Scheme was to ensure that Yanchukov would assume control of White Tiger and that Finskiy would suffer no losses from his investments in White Tiger, by convincing Yanchukov and various financial institutions to heavily invest in White Tiger, feeding them false information and withholding other material information, while Finskiy worked to divest himself of his interests in White Tiger and Century (hereinafter referred to as the "Gold Mining Enterprise").   Finskiy adapted his Gold Mining Enterprise as necessary over time, recruiting new co-conspirators to assist in his wrongful activities and changing tactics to keep Yanchukov in the dark.   The Gold Mining Enterprise was structured to operate as a unit, and its participants operated to accomplish the common purpose and goal of Finskiy's criminal scheme.

124.    Finskiy is associated with the Gold Mining Enterprise within the meaning of 18 U.S.C. § 1962(c).   Operating out of New York where he owned an apartment, Florida, where he owns a

house, and Russia, Finskiy was responsible for directing and managing the misrepresentations and omissions made to Yanchukov for purposes of convincing him to invest in White Tiger and Century.  While it is not possible at this time to determine where Finskiy was when he made his numerous misrepresentations to Yanchukov over the phone or by electronic mail, upon information and belief, Finskiy directed the majority of the scheme from his properties in the United States, both in New York and Florida, including directing wire transfers, negotiating transactions, and initiating communications from those locations.  Indeed, several board meetings of White Tiger took place in New York, as described throughout this complaint.

125.    At all relevant times, Finskiy knew that White Tiger and Century were not the profitable investments he had represented, and his actions contributed to the problems faced by the company.  Finskiy directed his agents at his companies, TOMS, and other associates to facilitate his fraud.  He committed numerous criminal predicate acts in the United States.

126.    Finskiy was the primary architect of the Gold Mining Enterprise, and in concert with his companies, agents and associates, sought to ensure that Yanchukov and various financial institutions would irretrievably invest in White Tiger while Finskiy recouped all of his investments prior to the scheme being discovered.

127.    Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Finskiy's managers and associates constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

128.    During the Relevant Period, the Gold Mining Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**B.    Pattern of Racketeering Activity**

129.    Finskiy participated, directly and indirectly, in the conduct, management, or operation of the Gold Mining Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c) as follows:

       *1.    Wire Fraud in Violation of 18 U.S.C. § 1343*

130.    Finskiy committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

131.    With specific intent to defraud, Finskiy, knowingly devised his scheme to defraud Yanchukov, as well as various financial institutions, knowingly causing Yanchukov to make numerous investments in White Tiger and Century over the wires, despite Finskiy's knowledge that such investments would not be profitable, by means of material misstatements and omissions with respect to the viability of Century, including, but not limited to, the amount of gold reserves at the Savkino mine, and White Tiger's ability to repay the VTB loan funds.

132.    The objective of the scheme to defraud was to ensure that Yanchukov would assume control of White Tiger so that Finskiy would suffer no losses from his investments in White Tiger.  The scheme was enacted by convincing Yanchukov to heavily invest in White Tiger, feeding him false information and withholding other material information, while Finskiy worked to divest himself of his interests in White Tiger.  Through the scheme to defraud, Finskiy was able to conceal the troubled and failing nature of White Tiger and divest himself of interest in the company.

133.    In furtherance of the scheme to defraud, Finskiy caused funds to be transmitted by means of wire in interstate or foreign commerce, including, but not limited to, the following:

      a)      On or about September 14, 2010, Finskiy caused Yanchukov, through his company Faith Union, to enter into a subscription agreement to purchase 12,820,513

shares of Century, for Cdn $5,000,000.07.  Upon information and belief, this transaction was executed through Bank of New York Mellon.

b)      From November 2010 to November 2011, Finskiy caused Yanchukov to purchase Century shares for $3,836,505.81.  Upon information and belief, this transaction was executed through Bank of New York Mellon.

c)      On March 10, 2011, Finskiy caused Yanchukov, through his company, Faith Union, to loan White Tiger $3,000,000 by representing to him that Century was a good investment.

d)      On April 4, 2011, Finskiy caused Yanchukov, through Faith Union, to enter into its second subscription agreement with Century, purchasing 10,333,333 shares of Century for $3,775,170.84.  Upon information and belief, this transaction was executed through Bank of New York Mellon.

e)      On August 18, 2011, Finskiy caused Yanchukov, through Faith Union, to enter into its third subscription agreement with Century, purchasing 4,910,500 shares in Century for $982,100.   Upon information and belief, this transaction was executed through Bank of New York Mellon.

f)      On September 14, 2011, Finskiy caused Yanchukov, through Faith Union, to enter into another subscription agreement to purchase 12,820,513 shares of Century for Cdn $5,000,000.07.  Upon information and belief, this transaction was executed through Bank of New York Mellon.

g)      On October 3, 2011, Finskiy caused Yanchukov, through Faith Union, to loan White Tiger $3,000,000.

29

h)      On October 7, 2011, Finskiy caused Yanchukov, through Faith Union, to purchase shares in White Tiger and Century from the companies affiliated with Finskiy for $4,842,451.36.   Upon information and belief, this transaction was executed through Bank of New York Mellon.

i)      On November 7, 2011, Finskiy caused Yanchukov, through Unique Goals, to lend White Tiger another $12,000,000.

j)      On April 26, 2012, Finskiy caused Yanchukov, through Unique Goals, to loan another $3,000,000 to White Tiger for the purposes of refinancing the Lamaque mine, funding Lamaque to commercial production, supporting capital development at Savkino and for general corporate purposes.

k)      On July 25, 2012, Finskiy caused Yanchukov, through Unique Goals, to enter into a subscription agreement, purchasing 25,377,500 shares of White Tiger for $2,537,750. Upon information and belief, this transaction was executed through Bank of New York Mellon.

l)      On March 20, 2013, Finskiy caused Yanchukov, through Unique Goals to buy Finskiy and his partner Oleg Baibakov out of White Tiger by misrepresenting the viability of the company, and specifically the amount of gold reserves at the Savkino mine.   Upon information and belief, this transaction was executed through Bank of New York Mellon.

134.    Having devised the Gold Mining Scheme, Finskiy also made misrepresentations of White Tiger and Century's financial viability to Yanchukov over the wires by both phone and electronic mail, on specific occasions, including, but not limited to, as follows:

a)      In the fall of 2010, during a phone conversation, Finskiy told Yanchukov that Century was making a private placement and that this would be a good investment because Century would grow, despite knowledge to the contrary.

b)      On or about April 4, 2011, Finskiy represented to Yanchukov over the phone that Century was an excellent investment, despite knowledge to the contrary.

c)      On January 19, 2012, Finskiy emailed Yanchukov several monthly reports on the mining operations.  These reports, which painted a rosy picture of White Tiger's future, contained the inflated TOMS numbers for the Savkino mine, and indeed, suggested that the TOMS findings with respect to Savkino could be grounds for increasing reserves numbers as to the Ildikan mine.

> 2.    *Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in Violation of 18 U.S.C. § 2314*

135.    Finskiy engaged in the transportation of stolen, converted, or fraudulently-taken goods, securities, or money in violation of 18 U.S.C. § 2314.

136.    Finskiy transported, transmitted, or transferred goods, securities, or money, of a value of $5,000 or more in interstate or foreign commerce.  Specifically, upon information and belief, Finskiy orchestrated the use of VTB funds for improper purposes, repaying Bank MFK and Sberbank loans before they were due and in contravention of the VTB loan facility, making improper payments to sham corporations, and paying improper bonuses to White Tiger executives.  In addition, upon information and belief, Finskiy operated a secret underground pipeline to steal gold in liquid form from the Savkino mine, and bribed the mine workers to look the other way.

137.    Upon information and belief, some of the misappropriated funds and gold were used by Finskiy to purchase property and other assets in the United States.

138.    Finskiy did so knowing the VTB funds and Savkino gold had been stolen, converted, or taken by fraud.

> 3.    *Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. § 2315*

139.    Finskiy received, possessed, concealed, sold or disposed of goods securities, or money in violation of 18 U.S.C. § 2315.

140.    Finskiy received, possessed, concealed, sold, or disposed of goods, securities, or money with a value of $5,000 or more and that crossed a State or United States boundary after being stolen, unlawfully converted, or taken – namely, the VTB Funds and Savkino gold, which Finskiy converted to his own uses in the United States.

141.    Finskiy did this knowing that the VTB funds and Savkino gold had been stolen, unlawfully converted, or taken.

### C.    Nature of Pattern of Racketeering

142.    Finskiy committed a substantial number of related predicate acts over an extended period of time – from 2010 through 2013.  In addition, Finskiy's commission of predicate acts is part of his general course of business and will continue into the future unless and until he is prevented from doing so.

### D.    Injuries to Yanchukov

143.    Yanchukov was, and continues to be, injured by reason of Finskiy's violations of 18 U.S.C. § 1962(c) and the predicate acts described above.

144.    The injuries include, but are not limited to: (i) the loss of significant investments in Century, as well as the Savkino and Nasedkino mines, (ii) the loss of two tranches of VTB funding without any corresponding development of White Tiger's gold mines, (iii) the lost opportunity to recover the VTB funding and Savkino gold that Finskiy has dissipated, (iv)

Yanchukov's loans to White Tiger, which stand little to no chance of being repaid, and (v) losses in the value of White Tiger shares upon the discovery of Finskiy's fraud with respect to the Savkino mines' reserves and public knowledge of White Tiger's financial distress.

145.    Despite his diligence and efforts, Yanchukov's discovery of these ongoing injuries was delayed by Finskiy's fraudulent concealment activity.

146.    The injuries to Yanchukov were a direct, proximate, and reasonably foreseeable result of the violations of 18 U.S.C. § 1962(c) and the predicate acts enumerated at Paragraphs 139, 140 142, 143 and 146 above. Yanchukov has been, and will continue to be, injured in an amount to be determined at trial.

147.    Pursuant to 18 U.S.C. § 1964(c), Yanchukov is entitled to recover treble damages, plus reasonable costs and attorneys' fees from Finskiy.

### II.    Count II (RICO Conspiracy, 18 U.S.C. § 1962(d))

148.    Yanchukov hereby realleges and incorporates by reference each and every foregoing Paragraph of this Complaint as if set forth in full herein.

149.    Finskiy violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

150.    In connection with the Gold Mining Scheme and Enterprise, Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Finskiy's managers and associates agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity.

151.    Finskiy agreed to, and indeed, devised, the overall objective of the conspiracy, or agreed to commit personally at least two acts of racketeering.

152.    As a direct and proximate result of the predicate acts taken by Finskiy in furtherance of the conspiracy, Yanchukov has been injured in his business or property as set forth in Paragraphs 149 through 153 above.

153.    Pursuant to 18 U.S.C. § 1964(c), Yanchukov is entitled to recover treble damages plus costs and attorneys' fees from Finskiy.

### III.    Count III (Fraud)

154.    Yanchukov realleges and incorporates herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

155.    With the intent to defraud, Finskiy made material misrepresentations of fact to Yanchukov with respect to Century and White Tiger's profitability for investment purposes to induce Yanchukov to heavily invest in and loan funds to both White Tiger and Century, and ultimately to buy out Finskiy's interest in White Tiger, including not limited to, as follows:

a)      On or about April 4, 2011, Finskiy represented to Yanchukov over the phone that Century was an excellent investment, despite knowing about Century's continuing default under the Deutsche Bank gold forwarding facility;

b)      In May 2011, when Yanchukov visited Finskiy in Miami,  Finskiy assured Yanchukov that everything was going well with White Tiger, again despite knowing about Century's continuing default under the Deutsche Bank gold forwarding facility;

c)      On July 25, 2011, Finskiy asked Yanchukov to support Century, telling Yanchukov that Century would be expanding its operations, and that he was optimistic about its future.  Finskiy made these false statements even though he knew that a new technical report on the Lamaque mine issued by Micon showed a 75% drop in measured and indicated resources and a 59% drop in reserves, and even though he knew that he would need a new report inflating the Savkino mine's reserves to obtain funding from VTB;

d)      On October 28, 2011, during a White Tiger board meeting at New York's St. Regis Hotel, Finskiy represented to Yanchukov and others that the long-term prospects of the company were good.  Finskiy personally represented that the Savkino mine had at least 400 thousand ounces of extractable gold.

e)      On or about January 24, 2012, Finskiy and Yanchukov flew to New York from Toronto, where Finskiy took part in a conference.  Finskiy represented that that business was developing well, equipment was being purchased and that Lamaque would soon show great results, all the while knowing of Century's problems with Deutsche Bank.

f)      On or about February 25, 2012, at a dinner in Miami, Finskiy represented to agents of Yanchukov –Konstantinidi and Chetvertnykh – that White Tiger was doing well and was expected to produce 120 thousand ounces of gold in 2012 – 50 thousand ounces from the Savkino mine and 70 thousand ounces from the Nasedkino mine, despite his knowledge that the estimated reserves for the Savkino mine were false, and that the Nasedkino mine was not operating.

g)      On March 25, 2012, at a meeting at the St. Regis Hotel in New York, Finskiy asked Yanchukov to provide a short-term loan in amount of $1,200,000 million to White Tiger, stating that the Russian part of the company was doing well (again, knowing the Savkino estimates were greatly inflated), but that the Lamaque mine in Canada urgently needed money.

h)      In June 2012, Finskiy assured Yanchukov that White Tiger was able to repay the VTB loans, despite the Lamaque mine's seizure and his knowledge that the Savkino reserves were inflated.

35

i)       In January and February 2013, during a number of meetings between Finskiy and Yanchukov held in White Tiger's Moscow offices, Finskiy repeatedly assured Yanchukov that the Savkino mine had 430,000 ounces in gold reserves, rather than the 119,000 ounces it actually had.

156.    Upon information and belief, Finskiy knew that these representations were false when they were made.

157.    Finskiy knew that he held superior knowledge relative to Yanchukov and acted with the intent to deceive Yanchukov into heavily investing in and lending funds to Century and White Tiger, and ultimately buying Finskiy out of White Tiger.

158.    Finskiy had an obligation to speak truthfully to Yanchukov about such material matters and to avoid omitting material information due to his superior knowledge.

159.    Yanchukov actually and justifiably relied on Finskiy's material misrepresentations of fact in making his investments and loans, due to Finskiy's knowledge of, and experience in, the mining industry, ownership interest in White Tiger, and the personal relationship they shared. Those material misrepresentations of fact proximately caused Yanchukov injury in an amount to be determined at trial, plus punitive damages in an amount to be determined at trial.

160.    Due to the concealment of material facts until only recently, including, but not limited to, the information in the misleading TOMS report and the uses to which the VTB funds were put, Yanchukov was unaware and could not have become aware of Finskiy's fraud until he took control of White Tiger in 2013.

### IV.    Count IV (Civil Conspiracy to Commit Fraud)

161.    Yanchukov realleges and incorporates herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

162.    Finskiy formed and operated an unlawful conspiracy with his companies, associates and managers to defraud Yanchukov as described above.  This conduct includes, but is not limited to, materially misrepresenting whether Century and White Tiger would be profitable investments, and converting both the VTB funds and Savkino gold.

163.    Through concerted action as agreed upon with Kirkland, DZM, WTG Holdings, Inger, and Finskiy's managers and associates, as described above, Finskiy in fact engaged in conduct violative of Yanchukov's rights.

164.    Finskiy intended these actions to occur and intended to cause injury to Yanchukov as part of the Gold Mining Scheme.

165.    By virtue of the formation and operation of this unlawful conspiracy, and as a consequence of the above-described wrongful acts and conduct and the harm caused to Yanchukov, Finskiy is liable for the above-described acts committed by each conspirator.

166.    As a result of these acts and conduct, Yanchukov has suffered and will continue to suffer financial harm in an amount to be determined at trial, and other irreparable harm and loss.

### V.    Count V (Unjust Enrichment)

167.    Yanchukov realleges and incorporates herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

168.    Finskiy solicited Yanchukov to invest in Century and White Tiger under false pretenses because Finskiy made material representations and omissions as detailed above.

169.    As a result of Finskiy's wrongful conduct as alleged herein, Yanchukov has acquired investments in White Tiger (and formerly Century) that are not worth the value reported.

170.    By his wrongful acts and omissions alleged above, Finskiy received funds to which he was not entitled, and was unjustly enriched at the expense and to the detriment of Yanchukov.

171.    Finskiy was aware of the benefit that flowed to him and knowingly and voluntarily accepted and retained the benefit conferred by Yanchukov.

172.    Finskiy provided no fair consideration in exchange for the benefit conferred by Yanchukov, as he knew that the value of his shares was considerably lower than he had represented to Yanchukov.

173.    The circumstances are such that it is inequitable for Finskiy to retain the benefit conferred upon him and Yanchukov is entitled to the return of the proceeds of the Gold Mining Scheme.

174.    Finskiy has therefore been unjustly enriched at the expense of Yanchukov, in an amount to be determined at trial.

175.    No other remedy at law can adequately compensate Yanchukov for the economic damages resulting to him from Finskiy's wrongful actions as alleged herein.

176.    Yanchukov seeks restitution from Finskiy and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by Finskiy from his wrongful conduct.

## DEMAND FOR JUDGMENT AND RELIEF

WHEREFORE, Yanchukov demands judgment against Finskiy on each and every Count in his complaint and relief as follows:

Counts I and II

a)    Damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

b)    Pre-judgment interest according to statute; and

c)    Yanchukov's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

Counts III, IV, and V

a)    Judgment against Finskiy for compensatory damages according to proof at trial;

b) Punitive damages in an amount to be proven at trial; and

c) Disgorgement with respect to only Count V.

<u>All Counts</u>

a) Such other legal and equitable relief as the Court may deem just and proper.

Dated: October 15, 2015

**BLANK ROME LLP**


<u>*/s/ Inbal Paz Garrity*</u>
Inbal Paz Garrity, Esq.
Hannah Ahn, Esq.
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
Tel: (212) 885-5000
Fax: (212) 885-5001

*and*
Steven L. Caponi, Esq.
(*pro hac vice* application to be filed)
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel: (302) 425-6408
Fax: (302 428-5106


Bridget M. Briggs, Esq.
(*pro hac vice* application to be filed)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Tel: (215) 569-5664
Fax: (215) 832-5664
*Attorneys for Plaintiff Sergey Yanchukov*

39