# UNITED STATES DISTRICT COURT

## For The Southern District Of New York

Civil Action No.: 1:15-cv-08128-JPO

BETWEEN:

**SERGEY YANCHUKOV**

**UNIQUE GOALS INTERNATIONAL, LTD.,**

**FAITH UNION INDUSTRIES, LTD.**

**MANGAZEY MINING LIMITED**

<u>Plaintiffs</u>

**v**

**MAXIM FINSKIY**

**KIRKLAND INTERTRADE CORPORATION**

**DZM GOLD MINING LTD.**

**WTG HOLDINGS S.A.R.L**

**INGER INDUSTRIES**

<u>Defendants</u>

---

### CERTIFICATE OF EXHIBIT

---

This is Exhibit KS-1 as referred to in the Affidavit of service of Khephra Sylvester
dated this 28th day of March 2017

BEFORE ME:



_____
Notary Public/Commissioner for Oaths

# MAPLES

**Our ref**    JXY/707929/19373068
**Direct Tel**   +1 284 852 3013
**Email**     john.macdonald@maplesandcalder.com

**By Hand**

Inger Industries
c/o Jordans Trust Company (BVI) Limited
Geneva Place
Waterfront Drive
PO Box 3469
Road Town
Tortola VG1110
British Virgin Islands

23 March 2017

Dear Sirs

**Civil Action No. 1:15-cv-08128-JPO: SERGEY YANCHUKOVA, MANGAZEY MINING LIMITED & ORS v MAXIM FINSKY, KIRKLAND INTERTRADE CORPORATION & ORS**

We act for Rosenfeld & Kaplan, LLP and serve on their behalf the Amended Summons dated 19 August 2016 that was filed in the United States District Court for the Southern District of New York in the above proceedings.

Please kindly acknowledge receipt of this document by signing the attached copy of this letter.

Yours faithfully

*Maples and Calder*

Maples and Calder

Enc.

Received by (signature): _____

Position: CLIENT SERVICES DIRECTOR

Name(Please print): STACEY OLSON

Date: 23/3/2017

Time: 12:05 pm

**Maples and Calder**
Sea Meadow House  PO Box 173  Road Town  Tortola  VG1110  British Virgin Islands
Tel +1 284 852 3000  Fax +1 284 852 3097  maplesandcalder.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| SERGEY YANCHUKOV, UNIQUE GOALS INTERNATIONAL, LTD., FAITH UNION INDUSTRIES, LTD. AND MANGAZEYA MINING LIMITED<br><br>*Plaintiff(s)*<br><br>v.<br><br>MAXIM FINSKIY, KIRKLAND INTERTRADE CORPORATION, DZM GOLD MINING LTD., WTG HOLDINGS S.A.R.L., AND INGER INDUSTRIES,<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No.  1:15-cv-08128-JPO |

### AMENDED SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Inger Industries
c/o Jordans Trust Company (BVI) Limited
Geneva Place, Waterfront Drive
P.O. Box 3469
Road Town
Tortola
British Virgin Islands

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tab K. Rosenfeld
Rosenfeld & Kaplan, LLP
1180 Avenue of the Americas
Suite 1920
New York, New York 10036

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  8/19/2016

/s/ P. Canales

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   1:15-cv-08128-JPO

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                          _____
                                                         *Server's signature*

                                                         _____
                                                         *Printed name and title*

                                                         _____
                                                         *Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                  :

SERGEY YANCHUKOV, UNIQUE GOALS:
INTERNATIONAL, LTD., FAITH             :
UNION INDUSTRIES, LTD. AND        :
MANGAZEYA  MINING LIMITED       :
                                    :
           Plaintiff,          :
                                    :    CASE NO. 1:15-cv-08128
                                    :
v.                                    :
                                  :
MAXIM FINSKIY, KIRKLAND        :    **JURY TRIAL DEMANDED**
INTERTRADE CORPORATION, DZM   :
GOLD MINING LTD., WTG HOLDINGS  :
S.A.R.L., AND INGER INDUSTRIES,   :
                                    :
          Defendants.        :
-------------------------------------------------------X

## SECOND AMENDED COMPLAINT

**K&L GATES LLP**

Steven L. Caponi, Esq. (*pro hac vice*)
600 N. King Street
Suite 901
Wilmington, DE 19801
Phone: 302.416.7080
Fax: 302.416.7020
steven.caponi@klgates.com
*Attorneys for Plaintiffs*

Date: August 19, 2016

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

OVERVIEW ....................................................................................................................... 1

PARTIES TO THE ACTION .............................................................................................. 2

CORPORATE STRUCTURE OF WHITE TIGER ............................................................ 4

JURISDICTION AND VENUE ......................................................................................... 4

BASIS FOR ALLEGATIONS ........................................................................................... 6

   I.    Finskiy's Investments in Century and White Tiger ............................................. 6

   II.   White Tiger's Poor Financial Situation ............................................................... 9

     A.   Default under Deutsche Bank Gold Forwarding Facility and Loss of Century's Mines. 9

     B.   Fraudulent Obtainment and Misappropriation of VTB Funding ................................... 11

   III.  Defendants Begin Divesting Their Interests in White Tiger ......................................... 14

   IV.  Defendants' Misrepresentations and Plaintiffs' Investments ...................................... 15

     A.   Plaintiffs' Initial Investments into White Tiger ........................................................ 15

     B.   Defendants Begins to Reel In Plaintiffs .................................................................... 17

     C.   Finskiy Convinces Yanchukov to Buy Him Out ....................................................... 23

     D.   Discoveries of Defendants' Wrongdoing ................................................................... 26

   V.   The Parties' Legal Actions .......................................................................................... 27

COUNTS ........................................................................................................................... 28

   I.    Count I (Violations of RICO, 18 U.S.C. § 1962(c)) Against All Defendants ............... 28

     A.   The RICO Enterprise ................................................................................................ 29

     B.   Pattern of Racketeering Activity .............................................................................. 31

       1.   Wire Fraud in Violation of 18 U.S.C. § 1343 ...................................................... 31

       2.   Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in Violation of 18 U.S.C. § 2314 ............................................................. 33

       3.   Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. § 2315 ................................................... 33

     C.   Nature of Pattern of Racketeering ........................................................................... 34

     D.   Injuries to Plaintiffs ................................................................................................. 34

   II.   Count II (RICO Conspiracy, 18 U.S.C. § 1962(d)) Against All Defendants ............... 36

   III.  Count III (Fraud) Against All Defendants ................................................................... 37

   IV.  Count IV (Civil Conspiracy to Commit Fraud) Against All Defendants ..................... 40

V.    Count V (Unjust Enrichment) Against All Defendants ................................................. 41

DEMAND FOR JUDGMENT AND RELIEF .......................................................................... 42

ii

Plaintiffs Sergey Yanchukov ("Yanchukov"), Unique Goals International, Ltd. ("Unique Goals"), Faith Union Industries, Ltd. ("Faith Union"), and Mangazeya Mining Limited ("Mangazeya") (collectively "Plaintiffs") by and through their undersigned attorneys, for their claims and causes of action against Defendants Maxim Finskiy ("Finskiy"), Kirkland Intertrade Corporation ("Kirkland"), DZM Gold Mining Ltd. ("DZM"), WTG Holdings S.A.R.L. ("WTG Holdings"), and Inger Industries ("Inger") (collectively Defendants) allege and aver as follows:

## OVERVIEW

1.      This action is premised upon a scheme planned and executed by Finskiy, personally and in conjunction with companies he controlled – Kirkland, DZM, WTG Holdings, and Inger – in which Defendants, through a series of fraudulent misrepresentations and omissions, caused Plaintiffs and various banks, to loan significant funds to, and Yanchukov to ultimately purchase through Faith Union and Unique Goals, White Tiger Gold, Ltd. ("White Tiger"), resulting in considerable losses to Plaintiffs.

2.      White Tiger was a gold producer with properties held through subsidiaries in Peru, Quebec and Russia.  During the relevant time period, Finskiy was the Executive Chairman of, and controlled, White Tiger.  Yanchukov beneficially owned Unique Goals and Faith Union. Unique Goals and Faith Union provided a series of loans to, and made significant investments in, White Tiger beginning in 2011 and 2012, based upon false representations by Finskiy regarding the profitability of White Tiger.  Finskiy made these fraudulent representations after realizing that his own substantial investments in White Tiger were in peril.

3.      Beginning no later than 2010, acting in concert with associates and managers, Defendants devised and pursued a scheme to divest themselves of White Tiger and avoid suffering

1

substantial personal losses by fraudulently inducing Plaintiffs to acquire control of White Tiger. Ultimately, Defendants convinced Plaintiffs, and various banks, to heavily invest in White Tiger, by knowingly feeding them false information and withholding other material information, while at the same time working to divest themselves of their interests in White Tiger and Century (the "Gold Mining Scheme").

4.      Through these activities, Defendants, as well as their managers and associates, committed numerous acts of wire fraud and interstate transportation of stolen property in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961. Defendants' conduct also gives rise to various New York state common law claims.

5.      In March 2013, as a result of Defendants' fraudulent scheme, Plaintiffs acquired substantial shareholdings in White Tiger from companies owned and controlled by Finskiy and his business partner, Oleg Baibakov ("Baibakov"), including Kirkland, DZM and WTG Holdings, and became White Tiger's beneficial owners.

6.      Plaintiffs subsequently discovered that Defendants deliberately misrepresented and withheld material information regarding the viability of White Tiger and its gold mine reserves.

7.      As a result, Plaintiffs bring this action to recompense their losses.

## PARTIES TO THE ACTION

8.      Yanchukov is the owner of Faith Union and Unique Goals.  Through Unique Goals and Faith Union, he beneficially owns or has control over 338,300,208 shares of Mangazeya Mining Limited, formerly known as White Tiger.  He is the current CEO and a Board member of Mangazeya, and sits on Mangazeya's Corporate Governance and Compensation Committee.

9.      Unique Goals is registered in the British Virgin Islands and beneficially owned by Yanchukov.

2

10.    Faith Union is registered in the British Virgin Islands and beneficially owned by Yanchukov.

11.    Mangazeya Mining Limited, formerly known as White Tiger, is incorporated under the laws of the British Virgin Islands ("Mangazeya").

12.    Finskiy is a businessman with years of experience in leading Russian and global mining companies.  Previously, Finskiy was the majority owner, Executive Chairman and Director of White Tiger.  Finskiy is currently a majority owner and a Director in the publicly listed mining company Red Tiger Mining.  From 2008 to 2010, Finskiy was also the President of Intergeo Mining and Metals Company, the mining and exploration arm of the private Russian conglomerate Onexim Group, which is Russia's largest investment fund with $25 billion in assets.  From 1998 to 2001 Finskiy acted as First Vice Chairman of the Bank MFK, a part of Onexim Group.  From 2001 to 2008 Finskiy worked as Deputy Managing Director of OAO GMK "Norilsk Nickel", one of the largest Russian metal mining and production companies, which was partly controlled by the beneficiary of the Onexim Group.

13.    Kirkland, a company incorporated in the British Virgin Islands, is beneficially owned, directly and indirectly, by Finskiy.

14.    DZM, a company incorporated in the British Virgin Islands, is beneficially owned, directly and indirectly, by Finskiy.

15.    WTG Holdings, a company incorporated in Luxembourg, is beneficially owned, directly and indirectly, by Finskiy.

16.    Inger Industries Ltd. ("Inger") a company incorporated in the British Virgin Islands, is beneficially owned, directly and indirectly, by Oleg Baibakov, Finskiy's friend and business partner.

17.     Finskiy, Kirkland, DZM, WTG Holdings and Inger played roles, direct or indirect, in advancing the objectives of the Gold Mining Scheme.

## CORPORATE STRUCTURE OF WHITE TIGER

18.     White Tiger, a British Virgin Islands company, was publicly listed on the Toronto Stock Exchange ("TSX"), and owned gold mining properties in Russia, Canada and Peru.  White Tiger owned gold mine properties by way of ownership in Diascia Investment Ltd. ("Diascia Investments"), registered in Cyprus, and Diascia Holding BVI Ltd. ("Diascia Holdings"), which in turn owned shareholdings in the following Russian subsidiaries: Dalsvetmet LLC, Ildikangold LLC, Koryakmining LLC, Vostokmet LLC, Kalartsvetmet LLC and Geozvetmet LLC, each of which owned separate properties.  Dalsvetmet owns the Nasedkino licensed area in Russia, Ildikangold (currently, Mangazeya Mining LLC) owns the Savkino mine in Russia, Koryakmining owns the Zolinsko-Arkiinskaya licensed area, and Geozvetmet owns the Pridneprovskaya licensed area.  In October 2011, White Tiger amalgamated with Century Mining Corporation ("Century").

19.     Century, a company incorporated in Ontario, Canada, owned gold mining facilities in Lamaque, Quebec, and a San Juan mine in Peru.  Century combined with White Tiger in an amalgamation on October 20, 2011, becoming a subsidiary of White Tiger.

20.     In March 2013, White Tiger was taken under the control of Yanchukov and its name was later changed to Mangazeya Mining Ltd. ("Mangazeya").  Approximately 30% of Mangazeya shares are publicly traded on the stock exchange NEX in Toronto.

## JURISDICTION AND VENUE

21.     This action arises under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and the common law of New York.

22.     Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1367, and 18 U.S.C. § 1961, *et seq.*  Plaintiffs' state law claims arise out of the same case or controversy as the federal law claims, and all claims in this action arise out of a common nucleus of operative facts.

23.     The exercise of personal jurisdiction over Finskiy is reasonable and proper in this district because: (a) Finskiy resided and/or maintained an apartment in New York throughout the Relevant Period (2011 through 2013); and (b) Finskiy has conducted substantial and not isolated activity with New York throughout the Relevant Period, including maintaining an apartment in New York, owning a vehicle with a New York title, holding bank accounts in New York, paying taxes in New York, and directing many of the fraudulent activities described in this Complaint from New York.  Personal jurisdiction is further proper under 18 U.S.C. § 1965(a) because Finskiy resided in New York and transacted his affairs there throughout the Relevant Period.  In addition, by asserting counterclaims against Plaintiffs, Finskiy has subjected himself to the jurisdiction of this Court.

24.     The exercise of jurisdiction over Kirkland, DZM, WTG Holdings, and Inger is reasonable and proper in this district because Finskiy's actions in New York, as alleged throughout this complaint, were done both individually and on behalf of Kirkland, DZM, WTG Holdings, and Inger.  In addition, by asserting counterclaims against Plaintiffs, Kirkland, DZM and WTG Holdings have subjected themselves to the jurisdiction of this Court.

25.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and the Defendants have agents in this district and transact their affairs here.  Moreover, all parties have agreed this district is the proper venue for dispute resolution.

## BASIS FOR ALLEGATIONS

26.    The factual allegations in this Complaint are based on an international investigation by counsel and other professionals into the facts and circumstances alleged herein, including, without limitation, review and analysis of: documents, emails, subscription agreements, memoranda, loan agreements, management reports, press releases, Ontario Securities Commission filings, and other relevant documentation.

## I.    Finskiy's Investments in Century and White Tiger

27.    Beginning in approximately 2009, Finskiy identified White Tiger as a promising business opportunity and began to make a series of substantial direct and indirect investments in White Tiger.  Eventually his investments totaled in the tens of millions of dollars, allowing Finskiy to assume complete dominion and control over White Tiger and its operations.

28.    In September 2009, Finskiy, through Kirkland, first invested in Century, obtaining 7,142,857 Century shares for Cdn $20 million in a private placement.  The money from this purchase was to be used to develop Century's Lamaque gold mine in Quebec.

29.    On December 24, 2009, Finskiy purchased an additional 20,000,000 shares of Century, and on December 30, 2009, another 78,750,000 shares, investing $3,200,000 and $15,750,000 in each respective transaction.

30.    On January 13, 2010, three members of the Century's Board of Directors resigned (Ross Burns, Ricardo Campoy and Allen Ambrose) and two new directors were named – Fran Scola and W. Lamarque, both representing Finskiy.  Keith Hulley, another representative of Finskiy, was appointed to act as an advisor to the Board and later became interim CEO.  These changes to the board structure allowed Finskiy to assume control of Century.

6

31.     On December 13, 2010, White Tiger indirectly acquired, through Diascia Investments and Diascia Holdings, a 100% interest in Ildikangold, Dalsvetmet, Koryakmining, and Vostokzvetmet, four wholly-owned mining subsidiaries of LLC UK Dalsvetmet, a company wholly-owned directly and indirectly by Finskiy.  Four days later, on December 17, 2010, White Tiger purchased an 80% interest in Geozvetmet, another LLC UK Dalsvetmet subsidiary, in exchange for 85,000,000 common shares of White Tiger.  The result of this transaction was that Finskiy acquired 94.7% of White Tiger's issued and outstanding shares.

32.     On February 8, 2011, White Tiger loaned Century $800,000.

33.     On February 15, 2011, the International Company for Finance and Investment ("Bank MFK"), with which Finskiy has close relations, entered into loan facilities with White Tiger's subsidiaries, Ildikangold and Dalsvetmet for 450,000,000 and 250,000,000 rubles respectively.

34.     On March 11, 2011, White Tiger agreed to advance up to a further $3,200,000 to Century.

35.     On March 14, 2011, White Tiger announced its intent to merge with Century.

36.     On March 24, 2011, Century announced that it received an additional $1,500,000 tranche of funding from White Tiger.

37.     On June 13, 2011, Finskiy provided Century with $1,000,000 as a working capital loan for the Lamaque mine project.

38.     On August 30, 2011, Ildikangold entered into loan facility with Sberbank for 300,000,000 rubles.

39.     On September 27, 2011, White Tiger and Century entered into a credit facility agreement, pursuant to which, White Tiger agreed to fund Century's expansion plans through 2011, up to $10,000,000.

40.     On October 20, 2011, White Tiger and Century formally merged.  Pursuant to the amalgamation, a subsidiary of White Tiger acquired all of the issued and outstanding common shares of Century.

41.     On December 16, 2011, White Tiger, through Ildikangold and LLC WTG Management, acquired a 100% interest in Kalarsvetmet for $2,000,000 from DZM.

42.     On March 21, 2012, Diascia Investments, as sole participant of Dalsvetmet and Ildikangold, passed board resolutions to lend $40,000,000 to each company.   Diascia Investments received the money from VTB Capital Plc ("VTB") under a Facility Agreement dated March 7, 2012.

43.     In the spring of 2012, Finskiy arranged for White Tiger to receive bridging loans, including $2 million from Kirkland on March 27, 2012, and another $1,000,000 on April 5, 2012.

44.     On May 14, 2012, White Tiger received a $1 million loan directly from Finskiy.

45.     On June 13, 2012, Kirkland loaned White Tiger another $2,500,000.

46.     On July 5, 2012, White Tiger announced a proposed private placement.

47.     Under the first tranche of the private placement, on July 16, 2012, Kirkland acquired 55,830,500 shares in White Tiger for Cdn $5,583,050, which amount was offset by Kirkland's $2,500,000 loan to White Tiger on June 13, 2012.

48.     As a result of the foregoing, by the middle of 2012, Defendants had over $62,000,000 invested in White Tiger.  Rather than prove to be a successful venture, White Tiger soon began to falter, putting Finskiy at risk of losing a sizeable portion of his personal wealth.  Upon information and belief, seeking to avoid a disastrous result, Defendants embarked on an orchestrated effort to separate from White Tiger by having the aforementioned loans repaid or

8

converting the loans into equity that could more easily be liquidated.  In the end, through a series of fraudulently induced transactions, Defendants were able to unload their interests upon Plaintiffs, unwitting victims of Defendants' criminal enterprise.

## II.     White Tiger's Poor Financial Situation

### A.      Default under Deutsche Bank Gold Forwarding Facility and Loss of Century's Mines

49.     When Defendants, particularly Finskiy, first began investing in White Tiger and Century and thought the company had a bright future, steps were taken to obtain additional operating capital in the form of loans to facilitate the expansion of Century's mining operations.  Century, however, was never able to perform to expectations or meet its obligations under the loan agreements, putting Defendants' investment at risk.

50.     On December 22, 2009, Century executed a $33,000,000 prepaid gold forwarding facility with Deutsche Bank, pursuant to which Century agreed to deliver 61,183 ounces of gold to Deutsche Bank over five years in exchange for a $33,000,000 loan.

51.     On June 30, 2011, Century announced that a technical report on the Lamaque mine issued by Micon International Limited, showed a 75% drop in measured and indicated resources and a 59% drop in reserves from those estimated in a 2009 technical report.

52.     On July 25, 2011, Century entered into an amended and restated Deutsche Bank loan to amend Century's gold delivery obligations in light of the anemic production at Lamaque.

53.     On September 8, 2011, Century announced a second amended and restated Deutsche Bank loan to again address Century's gold delivery obligations.

54.     Due to a continuous default under the Deutsche Bank gold forwarding facility, on December 2, 2011, Deutsche Bank entered into a limited and conditional waiver in relation to the gold shortfall.

55.     By March 2012, Century was again in default of its obligations to Deutsche Bank.

56.     On May 21, 2012, Century advised Deutsche Bank that it faced an imminent cash flow shortage and, absent additional financing, it would not be able to deliver the Scheduled Monthly Gold Quantity for May 2012 and would not be able to meet obligations going forward.

57.     Just two days later, on May 23, 2012, Deutsche Bank was advised that White Tiger would not finance Century's operations past May 25, 2012, a decision that was, upon information and belief, controlled by Finskiy.

58.     As a result, on May 25, 2012, White Tiger announced that Deutsche Bank would be taking control of Century and its mines in Peru and Quebec due to Century's continuous default under the gold forwarding facility.

59.     On or about May 28, 2012, the Century mines were seized by a receiver on behalf of Deutsche Bank and shut down.

60.     In addition to Century's overall poor performance, the loss of the Lamaque and Peru mines placed Defendants' investments in the combined White Tiger, as well as Finskiy's personal financial position, in significant jeopardy.  Following the loss of the Lamaque mine, White Tiger had only one currently operating gold mine, the Savkino mine in Russia.  As a result, Defendants were forced to further leverage White Tiger's few remaining assets in a desperate effort to salvage their investments in White Tiger.

10

### B.      Fraudulent Obtainment and Misappropriation of VTB Funding

61.     Knowing that White Tiger was in financial distress, Defendants, upon information and belief, orchestrated a new funding facility with VTB by misrepresenting the future prospects of the company.  Defendants, however, never intended to use the VTB facility to benefit the operations of White Tiger.  Rather, realizing that White Tiger was a lost cause and that the VTB funding would not improve the prospects of the combined company, Defendants misappropriated the VTB funding for their own purposes.

62.     In July 2010, Daltsvetmet, which owned the Nasedkino mine and was still a subsidiary of DZM at the time, began negotiations with VTB Capital to obtain an $80 million loan for purposes of bringing the Nasedkino mine into production.  By late 2010, Daltsvetmet and VTB had agreed to the basic terms and conditions of the loan, pledge and hedge agreement.

63.     In July 2011, upon coming to a principal agreement of amalgamation with Century, and given the need to obtain financing for the amalgamated company's projects, it was resolved to increase the proposed VTB loan amount to $150 million, of which $80 million was intended for the development of the Savkino and Nasedkino mines in Russia, and $70 million was intended for the development of Century's mines, which had not yet been lost to Deutsche Bank.

64.     Pursuant to the new agreement, VTB put conditions on the loan, including a requirement that White Tiger obtain feasibility studies of the Savkino and Nasedkino mines in Russia, which studies were to be completed before issuance of the loan.  Defendants, however, were aware of a November 22, 2010 technical report on the mineral resources and reserves of the Savkino gold mine in Russia that had been issued by Micon International ("Micon").  The report indicated the Savkino mine had 113 koz of proved and probable gold reserves as of September 1, 2010, an amount too low to secure the VTB loan.

11

65.     Upon information and belief, in order to obtain the VTB funding, Defendants decided to hire TOMS Engineering, LLC ("TOMS") to conduct the new feasibility study of Savkino, to fraudulently inflate the findings of a feasibility study conducted the prior year by Micon. Defendants were determined to suppress the adverse findings in the Micon report and to fabricate a report that would further their fraudulent scheme to divest themselves of a losing investment in White Tiger.

66.     On October 19, 2011, Ildikangold entered into agreement with TOMS to prepare a more favorable report on the Savkino mine, on an extremely short turnaround, by November 15, 2011.

67.     On October 28, 2011, at the first post-Century merger board meeting of White Tiger, which was held in New York at the St. Regis Hotel with Yanchukov in attendance, Finskiy distributed presentation materials stating that the proven reserves for Savkino were, "at least 400 koz of extractable gold," despite the Micon report, and the fact that TOMS had not yet issued its report.

68.     A month and a half later, on December 13, 2011, TOMS issued its technical report on the Savkino mine's mineral resources and reserves.  The report indicated an increase in gold reserves from 113 thousand ounces in the Micon report issued just one year earlier, to 3.8 times that amount - 438.9 thousand ounces.  On January 4, 2012, the results of the TOMS Report on the Savkino mine were published in a press release.

69.     On or about February 2, 2012, VTB, believing that its conditions had been met by the TOMS report and a report on Nasedkino, formally entered into a $150 million loan facility with Diascia Investments.  The facility was divided up into three tranches: $40 million to fund exploration, $40 million for development, and $70 million for production activities.  The facilities contained guarantees from White Tiger, Diascia Investments, and White Tiger's five

12

operating company subsidiaries.  On March 7, 2012, upon satisfaction of all covenants as set forth under the loan terms and conditions, VTB and Diascia Investments signed an Addendum to the Facility Agreement.

70.     On March 26, 2012, and again on March 29, 2012, the first tranche of the VTB facility was drawn down.  Rather than being used for the exploration and development of the Savkino and Nasedkino mines as provided in the agreement, Finskiy, upon information and belief, knowing that White Tiger could not correct the defaults under the Deutsche Bank facility and that the Savkino reserves were vastly overstated, ensured that the funds were instead used to prop-up his other entities.  On March 29, 2012, Finskiy used the VTB facility to repay the loans made by Bank MFK and Sberbank to White Tiger's operating companies, Dalsvetmet and Ildikangold, despite the fact that these loans were not yet due and had lower interest rates than that under the VTB Facility, leaving Century in debt, and with no operating capital.  It total, about $25 million was transferred to Bank MFK (a part of Onexim Group) and $10 million to Sberbank. Both of those banks are significant players in the industry and Finskiy needed to preserve his relationships with them to protect his other business ventures.

71.     On March 29, 2012, on the same day that Ildikangold and Dalsvetmet repaid the loans to Bank MFK (a part of Onexim Group), Kirkland entered into a $30 million Loan Agreement with Onexim Group Management Limited (also a part of Onexim Group), which amount was transferred to Kirkland that day.  Thus, upon information and belief, the VTB funding misappropriated to repay the MFK Bank loans went through the Onexim Group and was ultimately paid to Kirkland.  On February 26, 2013 Kirkland repaid $5 million to Onexim Group Management Limited; however, Kirkland remains in possession of approximately $25 million.

72.     On October 10, 2012, the second tranche of the VTB facility was drawn down by $19 million.  Under Finskiy's control, this funding was used to make payments to sham corporations and pay improper bonuses and loans to White Tiger executives, rather than its intended purpose of mine development.

73.     Perpetuating a worsening financial position, as a result of the improper loan repayments and other misappropriation of VTB funding, Dalsvetmet and Ildikangold were left without any working capital during the active production phase of 2012.  Starved of capital, the mines' production results in 2012 were poor, leaving White Tiger unable to pay its current liabilities or invest in future production.

### III.     Defendants Begin Divesting Their Interests in White Tiger

74.     Upon information and belief, recognizing their fraudulent shell game would eventually be exposed and White Tiger would collapse, Defendants accelerated their plan to extricate themselves from White Tiger.

75.     On February 2, 2012, the date Diascia entered into the VTB loan facility, Finskiy began taking steps to pull out of White Tiger.  On that date, Finskiy sold 1,641,412 of his shares of White Tiger.

76.     On July 16, 2012, Kirkland acquired 55,830,500 shares in White Tiger for Cdn $5,583,050 under the first tranche of the Private Placement, which was offset by the $2,500,000 loan from June 13, 2012.  This was the first of several transactions in which Defendants converted their loans to White Tiger into equity, which could more easily be sold to others.

77.     On October 16, 2012, then-White Tiger CEO James McBurney requested that Yanchukov and Finskiy each provide $5,250,000 million to White Tiger to avoid the delisting of the company on Canada's TSX.  Despite the fact that Yanchukov and Finskiy agreed to provide

14

the funds by mid-March 2013, Finskiy refused to provide such financing and instead pushed Yanchukov to buy him out.

78.    On October 19, 2012, the April 5, 2012 and May 14, 2012 loans from Finskiy to White Tiger were converted into White Tiger shares pursuant to a Loan Conversion Agreement. Finskiy received 53,104,577 White Tiger shares at that time.

**IV.    Defendants' Misrepresentations and Plaintiffs' Investments**

79.    Despite the above transactions, Defendants had long-recognized their significant equity in White Tiger was in peril and Finskiy's personal fortune in jeopardy.  As a result, Defendants determined that they needed to quickly divest all of their interests in White Tiger to an unsuspecting victim, and identified Yanchukov, a trusting friend who was already involved in the company, as their "mark."  Ultimately, Defendants divested their own interests in White Tiger by convincing their mark, Yanchukov, to buy them out through Unique Goals and Faith Union, leaving Plaintiffs holding the empty bag.

80.    Finskiy and Yanchukov first met in 2006 and became friends, often vacationing and engaging in recreational sporting activities together.  In 2010, Finskiy even asked Yanchukov to become his child's godfather.  By that time, the two men were spending substantial amounts of time together, often with their families.

**A.    Plaintiffs' Initial Investments into White Tiger**

81.    Relying on the confidences he had developed, Finskiy represented to, and convinced, Yanchukov that he had considerable and successful experience in the mining industry in Russia and across the globe.

82.    In the fall of 2010, almost a year after Finskiy himself had invested in Century, Finskiy encouraged Yanchukov to invest in Century as a minority shareholder.  Despite information to

15

the contrary, Finskiy trumpeted his inside knowledge of Century, assuring Yanchukov that the company was poised to become highly profitable.   Upon information and belief, Finskiy sought Yanchukov's investment to raise money for Century and to increase his influence over Century's minority shareholders for the anticipated amalgamation with White Tiger.

83.     Relying on his friend's false statements, on September 14, 2010, Yanchukov, through Faith Union, entered into the first of three subscription agreements to purchase shares of Century, agreeing to purchase 12,820,513 shares for Cdn $5,000,000.07.

84.     From November 30, 2010 until November 7, 2011, Faith Union purchased additional Century shares from the market, spending $3,836,505.81.

85.     Later in March 2011, while on vacation with their families in the Maldives, Finskiy and Yanchukov discussed Century.   Finskiy reiterated his statements that Century was a good investment, spoke highly of the company's current operating position, and encouraged Yanchukov to deepen his involvement with Century.

86.     On April 4, 2011, in response to requests by Finskiy that Yanchukov support Century, Faith Union entered into its second subscription agreement with Century, agreeing to purchase 10,333,333 shares of Century.

87.     Following their successful effort to cause Plaintiffs to make substantial investments in Century, Defendants began to initiate their plan to transfer their substantial financial risk in White Tiger to Plaintiffs.   The crux of the plan was to incrementally cause Plaintiffs to make additional investments in White Tiger under the false understanding that the investments were necessary to save White Tiger from a short term liquidity crisis.   Defendants, however, knew White Tiger was structurally flawed, and its collapse only a matter of time.   Defendants hid this

16

information from Plaintiffs and instead, continued to present Plaintiffs with false information suggesting that White Tiger was fundamentally sound.

**B.      Defendants Begins to Reel In Plaintiffs**

88.     On July 25, 2011, Century entered into the amended and restated Deutsche Bank loan to amend Century's gold delivery obligations in light of the low production at Lamaque.   On that same day, Finskiy again asked Yanchukov to support Century, claiming that without his help, the company would be lost to Deutsche Bank.  Finskiy told Yanchukov that Century would be expanding its operations, and that he was optimistic about its future.  Finskiy made these statements despite knowing about the report on Lamaque, indicating that its reserves were substantially lower than previously believed and it would be unable to satisfy its obligations to Deutsche Bank.

89.     In reliance on Finskiy's representations, on August 18, 2011, Yanchukov caused Faith Union to enter into its third subscription agreement with Century, purchasing 4,910,500 shares in Century for $982,100.  Again in reliance on Finskiy's representations, on September 14, 2011, Faith Union executed another subscription agreement to purchase 12,820,513 shares of Century for Cdn $5,000,000.07.

90.     On October 3, 2011, Yanchukov, through Faith Union, loaned White Tiger another $3,000,000, repayment of which was due on December 15, 2011.  By this time, upon information and belief, Defendants had already determined to hire TOMS to inflate the Savkino reserves in the feasibility study due to VTB.

91.     Relying upon Finskiy's representations of profitability, on October 7, 2011, Yanchukov, through Faith Union, purchased shares in White Tiger and Century from several companies

17

owned by or affiliated with Finskiy, namely Caninton Trading Ltd (Belize), Bryton Services Ltd

(Belize), and Polar S.A. (Commonwealth of Dominica) for a total amount of $4,842,451.36.

92.     On October 28, 2011, the first post-merger board meeting of White Tiger was held in

New York at the St. Regis Hotel.  In attendance, among others, were Finskiy on behalf of his

companies and Yanchukov on behalf of Faith Union.  During this meeting, White Tiger's

financial status and ability to discharge its debts was discussed.  It was at this meeting that

Finskiy distributed presentation materials indicating that the proven reserves for Savkino were

"at least 400 koz of extractable gold," before the TOMS report had even been completed.  In

addition, a cash forecast prepared by White Tiger's management, upon information and belief, at

the direction of Finskiy, indicated that Lamaque's cash flow would steadily improve.  At this

meeting, Finskiy told Yanchukov that White Tiger needed a bridging loan to meet its obligations

to Deutsche Bank and help develop Lamaque so that Deutsche Bank would not be able to take

over the mines.  Finskiy represented that the loan could be repaid in January 2012 and that the

company's long-term prospects were good.

93.     Based upon Finskiy's representations at the October 28, 2011 meeting, Unique Goals

entered into an agreement to loan White Tiger $3,000,000 that very day.  The loan was to be

repaid by April 27, 2012.  A little over a week later, on November 7, 2011, Unique Goals loaned

White Tiger another $12,000,000, again based upon Finskiy's representations.

94.     Around this time, Finskiy began telling Yanchukov that Century would be able to meet

its gold delivery obligations, but that Deutsche Bank was aggressively demanding immediate

repayment of its loan.  Finskiy knew this information to be false and that Century would not be

able to meet its commitments to Deutsche Bank.  As a result of Finskiy's fraudulent statements

and assurances, on December 15, 2011, Faith Union agreed to extend its October 3, 2011 loan to

White Tiger until February 1, 2012 so that White Tiger would have the liquidity necessary to satisfy Deutsche Bank.

95.     Despite these investments, in January 2012, Finskiy begged Yanchukov, as the beneficial owner of Faith Union and Unique Goals, to further support White Tiger with additional investments and to help organize a large credit facility so that the company could expand.  To this end, on January 19, 2012, Finskiy emailed Yanchukov several monthly reports on the mining operations of White Tiger.  These reports, which painted a rosy picture of White Tiger's future, contained the inflated TOMS numbers for the Savkino mine, and indeed, suggested that the TOMS findings with respect to Savkino could be grounds for increasing reserves numbers as to the Ildikan mine.  Contrary to the information provided to Yanchukov, upon information and belief, Finskiy knew that the funds would never be used to expand the company, that the company would never have the ability to repay the credit facility and that the TOMS findings were fictitious.

96.     On February 24, 2012, Sergey Chalykh (Finskiy's top manager) provided Evgeny Konstantinidi (Yanchukov's top manager) with various materials regarding White Tiger's February 2012 Board Meeting.  These materials contained the inflated reserve amounts for the Savkino mine, and indicated that the Savkino mine had met all of its key targets for mining and processing in 2011, despite production having been significantly lower than budgeted.  Finskiy knew this information was false.

97.     In February 25-27 2012, Konstantinidi travelled to Miami and, along with Sergey Tchetvertnykh (an external business adviser to Yanchukov), participated in meetings with Finskiy on behalf of Yanchukov with respect to another set of mining interests – Red Tiger Gold. At dinner after this meeting, Finskiy and Francis Scola (a long time business partner of Finskiy, a

19

shareholder, and a board member of Century, White Tiger and Red Tiger) told Konstantinidi and Tchetvertnykh that White Tiger was doing well and was expected to produce 120 thousand ounces of gold during the year 2012.  Upon information and belief, Finskiy and Scola knew these statements were untrue and made them as part of the scheme to fraudulently secure additional investments from Plaintiffs.

98.     One month later, on March 25, 2012, Yanchukov, on behalf of Unique Goals and Faith Union, met with Finskiy, on behalf of Defendants, at the St. Regis Hotel in New York to discuss the financing of White Tiger.  During this meeting, Finskiy asked Yanchukov to provide a short-term loan to White Tiger of $1.2 million.  Finskiy stated that the Russian part of the company (including the Savkino mine) was doing well, but that the Canadian piece (the Lamaque mine), needed money.  During this meeting, the two also discussed the prolongation of Plaintiffs' loans to White Tiger.  Upon information and belief, Finskiy was well aware at the time he made these statements that they were false and that the loss of the Lamaque mine to Deutsche Bank was inevitable.

99.     In response to, and in reliance on, the fraudulent statements at the March 25, 2012 meeting, Faith Union signed a bridge loan with Kirkland for $1,200,000.  The funds, however, were transferred to the bank account of White Tiger, not Kirkland.  On April 6, 2012 the loan was repaid from Kirkland's account.

100.    On April 26, 2012, Unique Goals loaned another $3,000,000 to White Tiger for the purpose of refinancing the Lamaque mine, funding Lamaque to commercial production, and to support capital development at the Savkino mine.  In addition, Unique Goals' October 28, 2011 loan agreement with White Tiger was amended to extend its maturity date to May 15, 2012.  These investments were made in direct reliance on fraudulent statements and fictitious

20

documents provided by Defendants, showing that the Lamaque and Savkino mines were in strong financial condition.  In fact, Defendants, upon information and belief, knew the mines lacked the reserves and production capabilities to survive, let alone meet their financial obligations.

101.     Subsequently, when the Unique Goals and Faith Union loans to White Tiger matured in May 2012, Defendants prevailed upon Plaintiffs to restructure the loans to provide White Tiger with additional time to grow before repayment.  In connection with these discussions, Finskiy provided Yanchukov with the weekly report and summary of the Lamaque mine as of May 13, 2012, and a valuation of the Russian portion of White Tiger's holdings, the second of which indicated high extraction of gold for the years 2012 to 2014.  In reliance on these reports, Plaintiffs restructured the loans as requested.  Upon information and belief, however, Finskiy knew that the information he had provided to secure the restructuring was completely false and that the collapse of the mines was inevitable.

102.     The following month, Yanchukov visited Finskiy, in Moscow to discuss Plaintiffs' investments in the company.  During that meeting, Finskiy assured Yanchukov and provided him with documentation indicating that the companies were able to repay the VTB loan and would provide him with a return on investment in time.  Once again, upon information and belief, Finskiy knew these statements to be fraudulent, but was compelled to continue furthering the scheme to extract Defendants' investments in White Tiger by fraudulently inducing Plaintiffs to continue infusing liquidity into a failing enterprise.

103.     In July 2012, Unique Goals entered into a subscription agreement, purchasing 25,377,500 shares of White Tiger in exchange for $2,537,750.  In addition, Unique Goals' loans to White Tiger were consolidated into a single loan of $20,429,602.74, and extended until January 31,

2015 so that White Tiger could successfully complete the 2012 production season.  Plaintiffs agreed to these transactions in reliance on the falsehoods perpetrated by Finskiy on behalf of Defendants and his assurances that White Tiger was a company with sound fundamentals, and only short term capital needs.

104.    In July 2012, Yanchukov, on behalf of Plaintiffs sent a representative, S. Techetvertnykh, to inspect the Lamaque and Savkino mines to investigate a sharp decrease in the extraction of gold.   Upon a site visit to Lamaque, it was discovered that the mine was not operating and was in poor shape.  A site visit to the Savkino mine, the main production mine of White Tiger, however, indicated that the mine was operating and appeared to be as represented.

105.    Soon thereafter, N. Bolshakov, the chief geologist of the operating activities of White Tiger, told several White Tiger executives, including Rinat Ismagilov, McBurney, and Geoffrey Cowley (a Director), who reported directly to Finskiy, that based upon a recent underground survey, there was a divergence between the amount of actual stored ore and that reflected in Savkino reporting.

106.    It was subsequently determined that the scale setting on a screening unit was set to overestimate the weight of ore by about 20%, with corresponding omissions and misrepresentations in geological and surveying reports that were supposed to provide independent verification of the amount ore.   Upon information and belief, Finskiy directly or indirectly participated in the misleading setting of the scale or knew of this scheme.

107.    On August 21, 2012, it was discovered that the contracts of several members of White Tiger's Executive Team, including McBurney, Cowley, and Hugh Blakely, were re-negotiated in July 2012 with no input from Faith Union or Unique Goals.

22

108.    On September 27, 2012, a meeting of the White Tiger Board was held at the Mandarin

Hotel in New York to discuss the company's financial situation, operations of the mines, and to

make presentations made to investors, including Plaintiffs.  During this meeting, Finskiy doubled

down on his prior fraudulent statements and continued to tell Plaintiffs that White Tiger was a

sound investment, its gold reserves were sufficient, and the cash crunch was only temporary.

### C.    Finskiy Convinces Yanchukov to Buy Him Out

109.    In contrast to Finskiy's many statements to the contrary, by early 2013, White Tiger was

in a dire situation.  It was facing a delisting review and had obtained significant funding from

VTB on false pretenses, which was misappropriated rather than used for development of the

mines.  And, on January 11, 2013, White Tiger announced that it had produced 18,261 ounces of

gold in 2012, which was insufficient to satisfy the gold sales covenant of the VTB facility.

110.    In January and February of 2013, Yanchukov and Finskiy met several times at White

Tiger's Moscow offices.  During these meetings, Finskiy offered to allow Plaintiffs to buy

Defendants and Baibakov out of White Tiger.  Upon information and belief, in order to sell

Plaintiffs on the idea, Finskiy, on behalf of Defendants, repeatedly assured Yanchukov that the

Savkino mine had 430,000 ounces in gold reserves (despite his knowledge that the TOMS report

had been inflated), and that the Savkino alone would return all of Plaintiffs' investments and

generate enough profits to repay the outstanding VTB loan.  Trusting Finskiy's greater

experience in the industry, Plaintiffs took the offer seriously.

111.    On February 22, 2013, Unique Goals loaned another $125,000 to White Tiger at the

express request and demand of McBurney, who represented that this was the only way to

renegotiate with VTB after White Tiger's default on the facility at the end of 2012, due to

insufficient gold production.  For the same reasons, Unique Goals loaned White Tiger another $500,000 on February 25, 2013, and $1,500,000 on March 4, 2013.

112.    In early January 2013, Unique Goals commissioned SRK Consulting to prepare reports on some of the company's mines, including Savkino (the "SRK Report").  The SRK report was issued in February 2013; it was short and based only on limited documentation Defendants' managers provided, which SRK was unable to fully verify.  Defendants' managers delayed the transfer of documents and information, which made SRK's task even more complicated.  Based on the limited documentation provided, SRK concluded, among other things, that if White Tiger reduced its expenses, the company could turn things around based on the represented 438,900 ounces of gold reserves.  Based on the documentation and data provided by Defendants' managers, Plaintiffs built an economic model, which led to a preliminary conclusion that it was possible to turn the economic situation at White Tiger around.

113.    On January 28, 2013 Tchetvertnykh (an external business adviser to Yanchukov), sent the economic model to Finskiy, Scola and Mc Burney asking them to check and verify the calculations. On the same day, Scola replied that they would send their model soon.  On January 29, 2013, by e-mail to Yanchukov, Tchetvertnykh, and Finskiy, Scola provided models for Savkino, Nasedkino and the exploration properties of White Tiger.  The Savkino model stated that the mine had 450,005 ounces of gold reserves, which amount was inflated.  The Nasedkino model indicated that the mine would begin generating revenue in 2016.  The model for the exploration properties indicated that the Zolin Arkiinsk mine had a total of 29,634 ounces of gold in its reserves and would begin generating revenue in the third quarter of 2013, and that all of the exploration properties were estimated at a value of $18,582,000,000.

114.    As of March 2013, the production at Savkino was extremely low.

24

115. On March 11, 2013, Yanchukov, still considering Finskiy's offer, became a director of White Tiger so that he could be more involved in decisions affecting Plaintiffs' investments. In addition, Unique Goals entered into an Escrow Agreement with Goodmans LLP to hold $12,435,018 for the potential purchase of White Tiger shares from Kirkland, DZM, WTG Holdings and Inger, which agreement was executed by Unique Goals, Kirkland, DZM, WTG Holdings and Inger.

116. On March 20, 2013, because Finskiy had represented that VTB's seizure of White Tiger's assets was imminent, and indeed had withheld funding in order to create an exigency that would put additional pressure on Plaintiffs, Plaintiffs were deceived into taking immediate action, and, through Unique Goals, agreed to buy Defendants out of White Tiger. In making this decision, Plaintiffs relied upon their economists' conclusion that it was possible to reach profitability and receive a return on the investments, which conclusion was based upon Defendants' false representations of the Savkino mine's reserves. Specifically, on or about this time: (1) Unique Goals and Kirkland executed a Share Purchase Agreement for Unique Goals' purchase of 75,680,522 shares of White Tiger from Kirkland for Cdn $3,784,026; (2) Unique Goals and DZM executed a Share Purchase Agreement for Unique Goals' purchase of 85,000,000 shares of White Tiger from DZM for Cdn $4,250,000; (3) Unique Goals and WTG Holdings executed a Share Purchase Agreement for Unique Goals' purchase of 78,019,849 shares of White Tiger from WTG Holdings for Cdn $3,900,992; and (3) Unique Goals and Inger executed a Share Purchase Agreement for Unique Goals' purchase of 30,000,000 shares of White Tiger from Inger for Cdn $1,500,000.

25

117.    On April 2, 2013, Unique Goals amended the terms of its March 4, 2013 bridging loan to White Tiger, increasing the loan amount to $12,500,000, with $2,300,000 advanced by a subsidiary of Unique Goals to Diascia Investments.

118.    On April 5, 2013, Plaintiffs purchased Defendants' shares in White Tiger.

119.    By April 9, 2013, Finskiy was relieved from his duties on the White Tiger Board, and Yanchukov became White Tiger's CEO, having dismissed McBurney.

### D.    Discoveries of Defendants' Wrongdoing

120.    After Plaintiffs purchased Defendants' interests in White Tiger, a MEF report was commissioned to conduct a financial audit of White Tiger.  A new geological study from Micon was also commissioned soon after Plaintiffs took over White Tiger.

121.    The MEF audit report was issued on June 25, 2013.   The report concluded that $30,000,000, which was documented as having been used for drilling work, had actually been misappropriated because the company that allegedly completed the work was registered only one month before it contracted to do the work, and then was placed in bankruptcy.  In addition, it was discovered that White Tiger's management team had been paid unreasonable bonuses despite the dire economic situation of the company.

122.    Around this time, it was discovered that White Tiger's interest in Kalarsvetmet, which it had purchased from DZM, was worthless because Kalarsvetmet had little or no reserves.  As a result, White Tiger voluntarily canceled the Kalarsvetmet license.

123.    On August 14, 2013, Plaintiffs, having been defrauded into making significant investments in White Tiger, announced ongoing negotiations with VTB to obtain a waiver or amend the terms of the VTB facility in order to save the company.  Unable to negotiate new terms with VTB that would allow White Tiger to ever turn a profit because of Defendants'

26

mismanagement of White Tiger, on October 3, 2013, White Tiger, having just been renamed Mangazeya, was forced to buy out Diascia Investments' VTB debt for market value ($59 million) and was assigned VTB's rights as to that loan.

124.    In August 2013, White Tiger implemented a new operations team led by new COO and director Sergey Kashuba.  When the team went to Savkino mine and counted the piles of ore, it was discovered that the ore on site was only half of what White Tiger had reported.  The team also found that the mine had a life of only four more years, which would not provide enough ore production to pay back VTB's loan, let alone Plaintiffs' investments.

125.    On October 19, 2013, Mangazeya issued 53,104,577 shares to Kirkland in satisfaction of its outstanding loans.

126.    In December 2013, Micon released its new technical report, which concluded that Savkino contained only 119 koz of extractable gold, rather than the 430 koz of gold Defendants had represented and persuaded TOMS to report.

127.    After receiving this information, Plaintiffs attempted to revise the terms of their purchase of Defendants' interest in White Tiger, but Defendants refused to negotiate.

## V.    The Parties' Legal Actions

128.    After Defendants, specifically Finskiy, refused to peacefully resolve the parties' dispute by discussing a renegotiation of Defendants' buyout, Yanchukov, in accordance with Russian law, made a criminal complaint against Finskiy to the Russian law enforcement authorities alleging large-scale fraud on April 14, 2014.  Thus, a criminal investigation of intended fraud committed on a large scale was commenced under part 4, Article 159 of the Criminal Code of the Russian Federation.

27

129.    On March 20, 2015, the Tagansky Court of the City of Moscow placed Finskiy under house arrest, and put an electronic tracking device on him.

130.    On April 7, 2015 Finskiy cut his electronic bracelet and fled Russia.  He was initially caught and detained at the Belarus border for three days, bearing a fake Azerbaijan passport in the name of Vladimir Mikhailovich Zaitsev.  Finskiy, however, ultimately fled again.

131.    As of April 8, 2015, Finskiy became a criminal wanted by Russian law enforcement authorities, and on April 9, 2015, an international fugitive wanted by Interpol.  A Russian judge issued a search warrant and order to arrest Finskiy.

132.    Based upon Defendants' recent filings, Plaintiffs understand that Finskiy is currently residing at his property in Florida.

133.    On July 31, 2015, Finskiy, Kirkland, DZM, and WTG Holdings filed suit against Mangazeya, Faith Union, Unique Goals and Yanchukov in the Eastern Caribbean Supreme Court in the British Virgin Islands, seeking a <u>worldwide</u> anti-suit injunction and termination of the criminal charges in Russia.

## COUNTS

**I.      Count I (Violations of RICO, 18 U.S.C. § 1962(c)) Against All Defendants**

134.    Plaintiffs reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

135.    During the Relevant Period, each of Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Defendants' managers and associates, was a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

28

A.      **The RICO Enterprise**

136.    Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Defendants' managers and associates are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the Gold Mining Scheme described herein, to obtain money and property from Plaintiffs and various financial institutions by means of false or fraudulent pretenses and representations.   Specifically, the purpose of the Gold Mining Scheme was to ensure that Plaintiffs would assume control of White Tiger and that Defendants would suffer no losses from their investments in White Tiger, by convincing Plaintiffs and various financial institutions to heavily invest in White Tiger, feeding them false information and withholding other material information, while Defendants worked to divest themselves of all interests in White Tiger and Century (hereinafter referred to as the "Gold Mining Enterprise").   Defendants adapted this Gold Mining Enterprise as necessary over time, recruiting new co-conspirators to assist in their wrongful activities and changing tactics to keep Plaintiffs, and Yanchukov in particular, in the dark.   The Gold Mining Enterprise was structured to operate as a unit, and its participants operated to accomplish the common purpose and goal of Defendants' criminal scheme to leave Plaintiffs stuck with an empty bag.   Finskiy was at the center of the RICO Enterprise, which had a wheel and spokes structure.

137.    Defendants are associated with the Gold Mining Enterprise within the meaning of 18 U.S.C. § 1962(c).   Operating out of New York where he owned an apartment, Florida where he owns a house, and Russia, Finskiy, at the center of the wheel, was responsible for directing and managing the misrepresentations and omissions made by Defendants to Plaintiffs for purposes of convincing them to invest in White Tiger and Century, as well as the other actions of Defendants.   While it is not possible at this time to determine where Finskiy was when he made

29

all of his numerous misrepresentations to Plaintiffs over the phone or by electronic mail as this information would be available to only Finskiy himself, upon information and belief, Finskiy directed the majority of the scheme from his properties in the United States, both in New York and Florida, including directing wire transfers, negotiating transactions, and initiating communications from those locations.  Indeed, several board meetings of White Tiger took place in New York, as described throughout this complaint.

138.    At all relevant times, Defendants knew that White Tiger and Century were not the profitable investments they represented, and their actions contributed to the problems faced by the company.  Defendants directed their agents, TOMS, and other associates to facilitate this fraud, and committed numerous criminal predicate acts in the United States.

139.    Finskiy was the primary architect of the Gold Mining Enterprise, and in concert with the remaining Defendants, his other companies, agents and associates, as described in detail above, sought to ensure that Plaintiffs and various financial institutions would irretrievably invest in White Tiger while Defendants recouped all of their investments prior to the scheme being discovered.

140.    Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Defendants' managers and associates constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

141.    During the Relevant Period, the Gold Mining Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**B.    Pattern of Racketeering Activity**

142.    Defendants participated, directly and indirectly, in the conduct, management, or operation of the Gold Mining Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c) as follows:

*1.    Wire Fraud in Violation of 18 U.S.C. § 1343*

143.    Defendants committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

144.    With specific intent to defraud, Defendants, knowingly devised their scheme to defraud Plaintiffs, as well as various financial institutions, knowingly causing Plaintiffs to make numerous investments in White Tiger and Century over the wires, despite Defendants' knowledge that such investments would not be profitable, by means of material misstatements and omissions with respect to the viability of White Tiger and Century, including, but not limited to, the amount of gold reserves at the Savkino mine, the expected life of the Savkino mine, and White Tiger's ability to repay the VTB loan funds.

145.    The objective of the scheme to defraud was to ensure that Plaintiffs would assume control of White Tiger so that Defendants would suffer no losses from their investments in White Tiger. The scheme was enacted by convincing Plaintiffs to heavily invest in White Tiger, feeding them false information and withholding other material information, while Defendants worked to divest themselves of their interests in White Tiger. Through the scheme to defraud, Defendants were able to conceal the troubled and failing nature of White Tiger and divest themselves of interest in the company.

146.    In furtherance of the scheme to defraud, Defendants caused funds to be transmitted by means of wire in interstate or foreign commerce, including, but not limited to, the following:

31

a)      On March 10, 2011, Defendants caused Faith Union to loan White Tiger $3,000,000 by representing that Century was a good investment;

b)      On October 3, 2011, Defendants caused Faith Union to loan White Tiger $3,000,000;

c)      On November 7, 2011, Defendants caused Unique Goals to lend White Tiger $12,000,000; and

d)      On April 26, 2012, Defendants caused Unique Goals to loan another $3,000,000 to White Tiger for the purposes of refinancing the Lamaque mine, funding Lamaque to commercial production, supporting capital development at Savkino, and for general corporate purposes.

e)      As each of these loans was denominated in U.S. dollars, upon information and belief, they each were processed through a United States bank.

147.    Having devised the Gold Mining Scheme, Finskiy on behalf of the other Defendants, also made misrepresentations of White Tiger and Century's financial viability to Yanchukov, as representative of Faith Union and Unique Goals, over the wires by both phone and electronic mail, on specific occasions, including, but not limited to, as follows:

a)      In the fall of 2010, during a phone conversation, Finskiy told Yanchukov that Century was making a private placement and that this would be a good investment because Century would grow, despite knowledge to the contrary;

b)      On or about April 4, 2011, Finskiy represented to Yanchukov over the phone that Century was an excellent investment, despite knowledge to the contrary; and

c)      On January 19, 2012, Finskiy emailed Yanchukov several monthly reports on the mining operations.  These reports, which painted a rosy picture of White Tiger's future,

32

contained the inflated TOMS numbers for the Savkino mine, and suggested that the TOMS findings with respect to Savkino could be grounds for increasing reserves numbers as to the Ildikan mine.

> 2. *Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in Violation of 18 U.S.C. § 2314*

148.    Defendants engaged in the transportation of stolen, converted, or fraudulently-taken goods, securities, or money in violation of 18 U.S.C. § 2314.

149.    Defendants transported, transmitted, or transferred goods, securities, or money, of a value of $5,000 or more in interstate or foreign commerce.  Specifically, upon information and belief, Defendants orchestrated the use of VTB funds for improper purposes, repaying Bank MFK and Sberbank loans before they were due, and in contravention of the VTB loan facility, in order to preserve industry relationships important to Defendants, making improper payments to sham corporations, and paying improper bonuses to White Tiger executives.

150.    Upon information and belief, some of the misappropriated funds were used by Finskiy to purchase property and other assets in the United States, given that Finskiy is now a permanent resident of the United States and a resident of Miami-Dade County, Florida, and is known to own real estate, a house, and at least two vehicles in the United States.  Finskiy obtained his green card based upon his investment in a commercial enterprise in the United States.

151.    Defendants engaged in this conduct knowing the VTB funds and Savkino gold had been stolen, converted, or taken by fraud.

> 3. *Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. § 2315*

152.    Defendants received, possessed, concealed, sold or disposed of goods securities, or money in violation of 18 U.S.C. § 2315.

153.    Defendants received, possessed, concealed, sold, or disposed of goods, securities, or money with a value of $5,000 or more and that crossed a State or United States boundary after being stolen, unlawfully converted, or taken – namely, the VTB Funds, some of which Finskiy converted to his own uses in the United States.

154.    Defendants did this knowing that the VTB funds had been stolen, unlawfully converted, or taken.

### C.    Nature of Pattern of Racketeering

155.    Defendants committed a substantial number of related predicate acts all in furtherance of the goals of the Gold Mining Scheme over an extended period of time – from 2010 through 2013.

### D.    Injuries to Plaintiffs

156.    Plaintiffs were, and continue to be, injured by reason of Defendants' violations of 18 U.S.C. § 1962(c) and the predicate acts described above.

157.    The injuries include, but are not limited to: (i) the loss of two tranches of VTB funding without any corresponding development of White Tiger's gold mines, (ii) the lost opportunity to recover the VTB funding that Plaintiffs have dissipated, and (iii) Plaintiffs' loans to White Tiger, which stand little to no chance of being repaid.

158.    In addition to the above described harm, throughout the relevant time period and continuing to the present, Mangazeya (formerly White Tiger) has had a non-immaterial portion of its shares held by investors who are United States citizens.  Similarly, it has been an important part of Mangazeya's business strategy to obtain financing by accessing the capital markets in the United States and securing investors residing in the United States.  As a direct result of Defendants' improper and fraudulent conduct, much of which occurred within the United States

34

and is described more fully herein, Mangazeya's business in the United States and internationally has been seriously, if not irrevocably, damaged.  As a result of being perceived as a company with questionable business practices, Mangazeya has suffered a loss in value, has been impeded from accessing the United States capital markets and has seen its stock price negatively impacted.  This has had a direct detrimental impact on both the value of Mangazeya and its future business prospects.

159.    In addition, Defendant Finsky has used tens of millions of dollars of funds improperly taken from Mangazeya and rightfully belonging to its stockholders, including those in the United States, to purchase property and other luxury items located in the United States.  These include: (i) a residence in Florida valued at approximately $15 million; (ii) exotic cars such as a Bentley and Lamborghini; and (iii) direct and indirect interests in numerous other properties in Florida collectively valued at nearly $40 million.

160.    As a direct result of Defendants' improper conduct, numerous Mangazeya stockholders who are citizens or are residing in the United States have been damaged by virtue of: (i) the damage to Mangazeya's business in the United States; (ii) damage to Mangazeya's future business prospects, including in the United States; (iii) loss in the value of their stockholdings; (iv) impediments to Mangazeya's ability to access the United States capital markets and obtain new investors who are citizens or residing in the United States; and (iv) the Defendants' diversion of tens of millions of dollars of Mangazeya assets to acquire property and other luxury items in the United States. Through this action, Mangazeya seeks to hold Defendants accountable for the direct injuries to Mangazeya and the resulting injuries inflicted upon its stockholders in the United States.

161.     Despite his diligence and efforts, Plaintiffs' discovery of these ongoing injuries was delayed by Defendants' fraudulent concealment activity, which included the false TOMS report, the misrepresentation of stacks of ore and expected life of the Savkino mine, and misrepresentations as to Kalarsvetmet mine's reserves.

162.     The injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violations of 18 U.S.C. § 1962(c) and the predicate acts enumerated at Paragraphs 141, 142 144, 145 and 148 above.  Plaintiffs have been, and will continue to be, injured in an amount to be determined at trial.

163.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, plus reasonable costs and attorneys' fees from Defendants.

**II.     Count II (RICO Conspiracy, 18 U.S.C. § 1962(d)) Against All Defendants**

164.     Plaintiffs hereby reallege and incorporate by reference each and every foregoing Paragraph of this Complaint as if set forth in full herein.

165.     Defendants violated 18 U.S.C. § 1962(d) by conspiring together to violate 18 U.S.C. § 1962(c).

166.     In connection with the Gold Mining Scheme and Enterprise, Finskiy, Kirkland, DZM, WTG Holdings, Inger, and Defendants' managers and associates agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity.

167.     Finskiy agreed to, and indeed, devised, the overall objective of the conspiracy, or agreed to commit personally at least two acts of racketeering, including the predicate acts described above in ¶¶ 145, 146, 148, 149 & 152.

36

168.     Kirkland agreed to the overall objective of the conspiracy, or agreed to commit personally at least two acts of racketeering including, but not limited to the predicate acts described above in ¶¶ 145, 148 & 152.

169.     DZM agreed to the overall objective of the conspiracy, or agreed to commit personally at least two acts of racketeering including, but not limited to the predicate acts described above in ¶¶ 145, 148 & 152.

170.     WTG Holdings agreed to the overall objective of the conspiracy, or agreed to commit personally at least two acts of racketeering including, but not limited to the predicate acts described above in ¶¶ 145, 148 & 152.

171.     Inger agreed to the overall objective of the conspiracy, or agreed to commit personally at least two acts of racketeering including, but not limited to the predicate acts described above in ¶¶ 145, 148 & 152.

172.     As a direct and proximate result of the predicate acts taken by Defendants in furtherance of the conspiracy, Plaintiffs have been injured in their business or property as set forth in ¶¶ 155-159 above.

173.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

### III.     Count III (Fraud) Against All Defendants

174.     Plaintiffs reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

175.     With the intent to defraud, Finskiy, on behalf of himself and the other Defendants, made material misrepresentations of fact to Yanchukov, agent of Faith Union and Unique Goals, with respect to Century and White Tiger's profitability for investment purposes to induce Plaintiffs to

37

heavily invest in both White Tiger and Century, and ultimately to buy out Defendants' interests in White Tiger, including not limited to, as follows:

a)      On or about April 4, 2011, Finskiy represented to Yanchukov over the phone that Century was an excellent investment, despite knowing about Century's continuing default under the Deutsche Bank gold forwarding facility;

b)      In May 2011, when Yanchukov visited Finskiy in Miami,  Finskiy assured Yanchukov that everything was going well with White Tiger, again despite knowing about Century's continuing default under the Deutsche Bank gold forwarding facility;

c)      On July 25, 2011, Finskiy asked Yanchukov to support Century, telling Yanchukov that Century would be expanding its operations, and that he was optimistic about its future.  Finskiy made these false statements even though he knew that a new technical report on the Lamaque mine issued by Micon showed a 75% drop in measured and indicated resources and a 59% drop in reserves, and even though he knew that he would need a new report inflating the Savkino mine's reserves to obtain funding from VTB;

d)      On October 28, 2011, during a White Tiger board meeting at New York's St. Regis Hotel, Finskiy represented to Yanchukov and others that the long-term prospects of the company were good.  Finskiy personally represented that the Savkino mine had at least 400 thousand ounces of extractable gold;

e)      On or about January 24, 2012, Finskiy and Yanchukov flew to New York from Toronto, where Finskiy took part in a conference.  Finskiy represented that the business was developing well, equipment was being purchased and that Lamaque would soon show great results, all the while knowing of Century's problems with Deutsche Bank;

f)      On or about February 25, 2012, at a dinner in Miami, Finskiy represented to agents of Yanchukov – Konstantinidi and Chetvertnykh – that White Tiger was doing well and was expected to produce 120 thousand ounces of gold in 2012 – 50 thousand ounces from the Savkino mine and 70 thousand ounces from the Nasedkino mine, despite his knowledge that the estimated reserves for the Savkino mine were false, and that the Nasedkino mine was not operating;

g)      On March 25, 2012, at a meeting at the St. Regis Hotel in New York, Finskiy asked Yanchukov to provide a short-term loan in amount of $1,200,000 to White Tiger, stating that the Russian part of the company was doing well (again, knowing the Savkino estimates were greatly inflated), but that the Lamaque mine in Canada urgently needed money;

h)      In June 2012, Finskiy assured Yanchukov that White Tiger was able to repay the VTB loans, despite the Lamaque mine's seizure and his knowledge that the Savkino reserves were inflated; and

i)      In January and February 2013, during a number of meetings between Finskiy and Yanchukov held in White Tiger's Moscow offices, Finskiy repeatedly assured Yanchukov that the Savkino mine had 430,000 ounces in gold reserves, rather than the 119,000 ounces it actually had.

176.    Defendants knew that these representations were false when they were made.

177.    Defendants knew that they held superior knowledge relative to Plaintiffs and acted with the intent to deceive Plaintiffs into heavily investing in Century and White Tiger, and ultimately buying Defendants out of White Tiger.

178.    Defendants had an obligation to speak truthfully to Plaintiffs about such material matters and to avoid omitting material information due to their superior knowledge.

179.    Plaintiffs actually and justifiably relied on Defendants' material misrepresentations of fact in making their investments and loans, due to Defendants' knowledge of, and experience in, the mining industry, ownership interest in White Tiger, and the personal relationship between Finskiy and Yanchukov.  Those material misrepresentations of fact proximately caused Plaintiffs injury in an amount to be determined at trial, plus punitive damages in an amount to be determined at trial.

180.    Due to the concealment of material facts, including, but not limited to, the information in the misleading TOMS report, the viability of the Savkino and Kalarsvetmet mines, and the uses to which the VTB funds were put, Plaintiffs were unaware of, and could not have become aware of, Defendants' fraud until they took control of White Tiger in April 2013.

**IV.    Count IV (Civil Conspiracy to Commit Fraud) Against All Defendants**

181.    Plaintiffs reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

182.    Defendants formed and operated an unlawful conspiracy with associated companies, associates and managers to defraud Plaintiffs as described above.  This conduct includes, but is not limited to, materially misrepresenting whether Century and White Tiger would be profitable investments, entering into subscription agreements with Faith Union and Unique Goals, and converting the VTB funds.

183.    Through concerted action as agreed upon with associated companies, associates and managers, as described above, Defendants in fact engaged in conduct violative of Plaintiffs' rights.

40

184.    Defendants intended these actions to occur and intended to cause injury to Plaintiffs as part of the Gold Mining Scheme.

185.    By virtue of the formation and operation of this unlawful conspiracy, and as a consequence of the above-described wrongful acts and conduct and the harm caused to Plaintiffs, Defendants are liable for the above-described acts committed by each conspirator.

186.    As a result of these acts and conduct, Plaintiffs have suffered and will continue to suffer financial harm in an amount to be determined at trial, and other irreparable harm and loss.

### V.    Count V (Unjust Enrichment) Against All Defendants

187.    Plaintiffs reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

188.    Defendants solicited Plaintiffs to invest in Century and White Tiger under false pretenses because Defendants made material representations and omissions as detailed above.

189.    As a result of Defendants' wrongful conduct as alleged herein, Plaintiffs have acquired investments in White Tiger (and formerly Century) from Defendants that are not worth the value reported.

190.    By the wrongful acts and omissions alleged above, Defendants received funds to which they were not entitled, and were unjustly enriched at the expense and to the detriment of Plaintiffs.

191.    Defendants, and in particular Finskiy, were aware of the benefit that flowed to them and knowingly and voluntarily accepted and retained the benefits conferred by Plaintiffs.

192.    Defendants provided no fair consideration in exchange for the benefits conferred by Plaintiffs, as they knew that the value of their shares was considerably lower than they had represented to Plaintiffs.

41

193.   The circumstances are such that it is inequitable for Defendants to retain the benefit conferred upon them and Plaintiffs are entitled to the return of the proceeds of the Gold Mining Scheme.

194.   Defendants have therefore been unjustly enriched at the expense of Plaintiffs, in an amount to be determined at trial.

195.   No other remedy at law can adequately compensate Plaintiffs for the economic damages resulting to them from Defendants' wrongful actions as alleged herein.

196.   Plaintiffs seek restitution from Defendants and seek an order from this Court disgorging all profits, benefits and other compensation obtained by Defendants from their wrongful conduct.

## DEMAND FOR JUDGMENT AND RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants on the Counts in this complaint and relief as follows:

Counts I and II

a)   Damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

b)   Pre-judgment interest according to statute; and

c)   Plaintiffs' reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

Counts III and IV

a)   Judgment against Defendants for compensatory damages according to proof at trial; and

b)   Punitive damages in an amount to be proven at trial.

<u>Count V</u>

c)      Judgment against Defendants for compensatory damages according to proof at

         trial;

d)      Punitive damages in an amount to be proven at trial; and

e)      Disgorgement.

<u>All Counts</u>

a)      Such other legal and equitable relief as the Court may deem just and proper.


Dated: August 19, 2016

                                            **K&L GATES LLP**

                                            Steven L. Caponi, Esq. (*pro hac vice*)
                                            <u>/s/ Steven L. Caponi</u>
                                            600 N. King Street
                                            Suite 901
                                            Wilmington, DE 19801
                                            Phone: 302.416.7080
                                            Fax: 302.416.7020
                                            steven.caponi@klgates.com

                                            *Attorneys for Plaintiffs*

43