UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
SERGEY YANCHUKOV, UNIQUE GOALS
INTERNATIONAL, LTD., FAITH UNION
INDUSTRIES, LTD., and MANGAZEYA
MINING LIMITED,

                              Plaintiffs,

                -v-

MAXIM FINSKIY, KIRKLAND INTERTRADE
CORP., DZM GOLD MINING LTD., WTG
HOLDINGS S.A.R.L., and INGER INDUSTRIES,
                              Defendants.
———————————————————————

15-CV-8128 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    This is a dispute between Russian citizens involving an overseas mining company. Plaintiff Sergey Yanchukov ("Yanchukov") filed suit against Maxim Finskiy ("Finskiy"), asserting claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); RICO conspiracy, *id.* § 1962(d); fraud; civil conspiracy to commit fraud; and unjust enrichment. Finskiy has filed counterclaims, also under RICO and state law.

    Currently pending before the Court are three motions to dismiss: (1) a motion to dismiss the Second Amended Complaint filed by defendants Finskiy, Kirkland Intertrade Corp. ("Kirkland"), DZM Gold Mining Ltd. ("DZM"), and WTG Holdings S.A.R.L. ("WTG") (Dkt. No. 77); (2) a motion to dismiss the pending counterclaims filed by Yanchukov, Unique Goals International, Ltd. ("Unique Goals"), Faith Union Industries, Ltd. ("Faith Union"), and Mangazeya (collectively, "Plaintiffs" or "Counter-Defendants") (Dkt. No. 93); and (3) a motion

1

to dismiss the Second Amended Complaint filed by defendant Inger Industries ("Inger") (Dkt. No. 126).[1]

For the reasons explained below, the allegations in both the complaint and the counterclaims fail to establish domestic injury for purposes of the RICO statute. Accordingly, the RICO claims are dismissed, and the Court declines to exercise supplemental jurisdiction over the state-law claims.

## I. Background

### A. Procedural Background

On March 16, 2016, Finskiy filed a motion to dismiss the original complaint. (Dkt. No. 19.) That same day, Finskiy and counterclaim-plaintiffs Kirkland, DZM, and WTG, filed counterclaims against counterclaim-defendants Yanchukov, Unique Goals, and Faith Union, asserting violations of RICO, 18 U.S.C. § 1962(c); RICO conspiracy, *id.* § 1962(d); breach of contract; and civil conspiracy; and requesting declaratory relief and issuance of an anti-suit injunction. (Dkt. No. 22.)

On May 18, 2016, plaintiffs Yanchukov, Unique Goals, and Faith Union filed a First Amended Complaint against defendants Finskiy, Kirkland, DZM, WTG, and Inger (collectively, "Defendants" or "Counter-Plaintiffs"). (Dkt. No. 41 (stipulation to file amended complaint); Dkt. No. 43 ("FAC").) On June 10, 2016, counterclaim-defendants Yanchukov, Unique Goals, and Faith Union filed a motion to dismiss Defendants' counterclaims. (Dkt. No. 58.) On June 20, 2016, defendants Finskiy, Kirkland, DZM, and WTG filed a motion to dismiss the FAC. (Dkt. No. 60.)

---

[1] Inger's motion to dismiss is essentially identical to the one filed by Finskiy, Kirkland, DZM, and WTG. The Court's conclusions apply equally to both motions.

2

On July 19, 2016, the Court endorsed the parties' stipulation consenting to leave to file a Second Amended Complaint and counterclaims, and denied the pending motions to dismiss as moot. (Dkt. No. 66.) The Second Amended Complaint, which added Mangazeya Mining Limited ("Mangazeya") as a plaintiff to the suit, was filed on August 19, 2016 (Dkt. No. 69 ("SAC")), and the counterclaims to the SAC were filed on September 26, 2016 (Dkt. No. 80 ("Counterclaim")).

## B. Factual Background

The following facts are taken from the SAC and the Counterclaims to the SAC, and are presumed true for the purposes of this motion.

Yanchukov is a Russian businessman (SAC ¶ 8), and Finskiy is a citizen of Russia who has permanent resident status in the United States (Counterclaim ¶ 2). Yanchukov owns Faith Union and Unique Goals, and through those entities he controls Mangazeya. (SAC ¶¶ 8, 20.) All three companies are registered or incorporated in the British Virgin Islands. (*Id.* ¶¶ 9–11.) Finskiy owns Kirkland, DZM, and WTG, which are entities through which Finskiy owned stock in White Tiger Gold Ltd. ("White Tiger"). (Counterclaim ¶¶ 21–23.) Finskiy also partially controls Inger. (SAC ¶¶ 1, 16.) Kirkland, DZM, and Inger are incorporated in the British Virgin Islands, and WTG is incorporated in Luxembourg. (*Id.* ¶¶ 13–16.)

At the center of this dispute is the purchase of White Tiger—a gold producer with mining properties in Peru, Quebec, and Russia that is now known as Mangazeya—by Yanchukov, through his companies Faith Union and Unique Goals, from Finskiy. (*Id.* ¶¶ 1–2, 8.) And although Yanchukov and Finskiy were at one time close friends (*id.* ¶ 80), Yanchukov now alleges that, based on Finskiy's "fraudulent misrepresentations and omissions," Yanchukov was

3

induced to significantly invest in White Tiger, leading to considerable financial losses (*id.* ¶¶ 1–2).

Yanchukov alleges that, through a series of transactions (*id.* ¶¶ 27–47), Defendants invested over $62,000,000 in White Tiger (*id.* ¶ 48). Yet when their investment "began to falter," "Defendants embarked on an orchestrated effort to separate from White Tiger," including by transferring their interest in White Tiger to Plaintiffs "through a series of fraudulently induced transactions." (*Id.*)

Specifically, Yanchukov alleges that Defendants "misrepresent[ed] the future prospects of the company." (*Id.* ¶ 61.) They did so by inflating the projected gold-producing capacities of the Savkino mine, one of the gold mining properties owned by White Tiger in Russia. (*Id.* ¶ 64–68.) In November 2010, a report indicated that the Savkino mine had 113 thousand ounces (or 113 "koz") of proved and probable gold reserves as of September 1, 2010. (*Id.* ¶ 64.) Yanchukov alleges that Defendants, unhappy with this report, hired TOMS Engineering, LLC ("TOMS") to conduct a new study of the Savkino mine, "to fraudulently inflate the findings" of the previous report. (*Id.* ¶ 65.) The TOMS report indicated that the Savkino mine had 438.9 koz of proved and probable gold reserves, significantly more than previously reported. (*Id.* ¶ 68.) Despite this relatively large reserve, the gold production rates at the Savkino mine were poor, leaving White Tiger in a financially precarious position. (*Id.* ¶ 73.) Seeing the writing on the wall, Defendants sought to divest their interest in White Tiger by convincing Yanchukov, through his companies Faith Union and Unique Goals, to substantially invest in White Tiger. (*Id.* ¶¶ 74, 81–87.)

At a board meeting for White Tiger in October 2011, Finskiy represented that the proven reserves for the Savkino mine were "at least 400 koz of extractable gold" and that cash flow

from White Tiger's other assets would continue to improve. (*Id.* ¶ 92.) Based on Finskiy's representations, Yanchukov, through Unique Goals, loaned $15,000,000 to White Tiger. (*Id.* ¶ 93.) In January 2012, "Finskiy begged Yanchukov" to continue investing in White Tiger, and he provided Yanchukov with additional reports—including the allegedly fraudulent TOMS report numbers—showing that the White Tiger mining operations might expand. (*Id.* ¶ 95.)

Yanchukov, on behalf of Unique Goals and Faith Union, again provided additional loans to White Tiger in March 2012 for $1,200,000 (*id.* ¶ 99) and in April 2012 for $3,000,000 (*id.* ¶ 100), and purchased $2,537,750 worth of shares in White Tiger in July 2012 (*id.* ¶ 103). Also in July 2012, Yanchukov sent a representative to inspect White Tiger's mining operations. The representative found that while one of the mines was in "poor shape," another was operating as expected. (*Id.* ¶ 104.) It was then determined that the over-reporting of gold ore at the Savkino mine in the TOMS report was caused by "the scale setting on a screening unit [that] was set to overestimate the weight of ore by about 20%." (*Id.* ¶ 106.)

By early 2013, White Tiger was in a "dire situation" because it had not produced enough gold ore in 2012. (*Id.* ¶ 109.) Nevertheless, Finskiy continued to rely on the TOMS report in an attempt to convince Yanchukov to buy Defendants out of White Tiger. (*Id.* ¶ 110.) Unique Goals commissioned a report on the mines that assumed the truth of the TOMS report. (*Id.* ¶ 112.) Based on that report, Plaintiffs concluded that if White Tiger reduced its expenses, it could turn the economic situation at White Tiger around. (*Id.*) In March and April of 2013, Plaintiffs purchased White Tiger. (*Id.* ¶¶ 116–19.)

After the purchase, a financial report determined that certain funds had been mismanaged (*id.* ¶¶ 120–21), and that, among other things, the Savkino mine had only half of the ore that White Tiger had reported (*id.* ¶ 124). Indeed, in December 2013, a new technical report found

5

that the Savkino mine had only 119 koz of extractable gold—not the 400-plus koz previously reported. (*Id.* ¶ 126.) Thereafter, Yanchukov filed a criminal complaint against Finskiy in Russia, alleging large-scale fraud, leading Finskiy to flee to the United States. (*Id.* ¶¶ 128–32.)

Finskiy tells a different story of the events that led to his flight to the United States and this lawsuit. Finskiy met Yanchukov in 2005 through Roman Zolotov. (Counterclaim ¶¶ 27, 52.) Roman Zolotov is the son of Viktor Zolotov, the former Deputy of the Ministry of Internal Affairs of the Russian Federation, current head of Russia's newly formed National Guard, and close associate to, ally of, and former bodyguard for Vladimir Putin. (*Id.* ¶¶ 15, 28.) Yanchukov was introduced as the Zolotov family's investment advisor, and Zolotov and Yanchukov told Finskiy that Yanchukov was looking for investment opportunities for the Zolotovs in the gold mining sector. (*Id.* ¶ 27.) Consistent with the allegations in the SAC, Finskiy alleges that Yanchukov ultimately invested heavily in White Tiger through his companies Unique Goals and Faith Union. (*Id.* ¶¶ 28–30.)

Yet White Tiger did not perform as expected, struggling financially through 2011 and 2012 due, in part, to the "falling price of gold." (*Id.* ¶ 34; *see id.* ¶ 78 n.1.) Throughout the relevant period, Yanchukov was aware of the financial issues with White Tiger, yet was "anxious to invest in the gold mining industry," and so offered to arrange loans for White Tiger "to assist the company." (*Id.* ¶ 34.) However, when Yanchukov became disappointed with the performance of White Tiger and his return on investment, he blamed Finskiy, demanding that Finskiy return his investments or "face trouble." (*Id.* ¶ 35.) When Finskiy refused, Yanchukov convinced one of White Tiger's major lenders to declare a default on its loan to White Tiger. (*Id.*) This, in turn, depressed the market price of the company's traded shares. (*Id.*)

6

Yanchukov then presented Finskiy with an ultimatum: if Finskiy did not willingly agree to sell all of his White Tiger shares to Yanchukov at this depressed price, Yanchukov threatened to use Viktor Zolotov's political power—as well as physical violence, including threats to Finskiy's life—to coerce the sale. (*Id.* ¶¶ 36, 79, 82.) Yanchukov assured Finskiy that this sale "would for all time resolve any complaints Yanchukov had or might have concerning his investment in White Tiger." (*Id.* ¶ 36.)

Under this pressure, Finskiy sold all of his White Tiger shares to Yanchukov for $13,000,000. (*Id.* ¶¶ 36–37.) As a result, Yanchukov became the majority shareholder and Executive Chairman of White Tiger and Finskiy resigned from the Board of Directors, no longer holding any interest or occupying any role in the company. (*Id.* ¶ 37.)

But Yanchukov was not finished with Finskiy. Approximately six months later, he accused Finskiy of misrepresenting White Tiger's financial prospects and threatened to have Finskiy killed by "Chechen thugs" or thrown in jail unless Finskiy paid him $150,000,000. (*Id.* ¶¶ 38, 105.) The extortion attempt failed, but Yanchukov, with the backing of Viktor Zolotov, made a criminal complaint to the Russian Ministry of Internal Affairs that eventually led Finskiy to flee Russia for the United States, where he currently resides. (*Id.* ¶¶ 38–40.)

## II. Legal Standard

Defendants Finskiy, Kirkland, DZM, and WTG filed a motion to dismiss the SAC for failure to state a claim upon which relief may be granted. (Dkt. No. 77). Defendant Inger filed a nearly identical motion to dismiss the SAC. (Dkt. No. 126). Counter-Defendants filed a motion to dismiss the counterclaims to the SAC for failure to state a claim. (Dkt. No. 93.)

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

7

(2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In considering a motion to dismiss, courts must accept as true all "factual allegations contained in the complaint," *Twombly*, 550 U.S. at 572 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)), and must draw "all inferences in the light most favorable to the non-moving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (Sotomayor, J.).

### III. Discussion

After this RICO action was commenced, the Supreme Court decided *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). As a result of this decision, on July 18, 2016, the parties submitted a stipulation to file the SAC in this action. (Dkt. No. 66.) However, as described below, neither Plaintiffs' claims in the SAC nor Counter-Plaintiffs' claims in the Counterclaim allege a "domestic injury" as required by *RJR Nabisco* and the RICO statute.[2]

Section 1962(c) of RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To establish a violation of § 1962(c), a plaintiff must show that a person engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cruz v. FXDirectDealer,*

---

[2] Because the Court concludes that neither Plaintiffs nor Counter-Plaintiffs allege a domestic injury, it does not address the remaining arguments made in the parties' briefing.

*LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)) (internal quotation marks omitted).

"Racketeering activity," under the statute, "encompass[es] dozens of state and federal offenses, known in RICO parlance as predicates." *RJR Nabisco*, 136 S. Ct. at 2096. And while violations of § 1962 are subject to criminal penalties, including imprisonment, fines or both, *see* 18 U.S.C. § 1963, Congress also provided for private civil actions by allowing "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal district court and recover treble damages, costs and attorney's fees, *see id.* § 1964(c).[3]

Recently, the Supreme Court considered whether RICO's private right of action applies to injuries that are suffered in foreign countries. *RJR Nabisco*, 136 S. Ct. at 2106–11. Concluding that § 1964(c) does not overcome the presumption against extraterritoriality, the Court held that "[s]ection 1964(c) requires a civil RICO plaintiff to allege and prove *a domestic injury to business or property* and does not allow recovery for foreign injuries." *Id.* at 2111 (emphasis added).

In *RJR Nabisco*, the respondent-plaintiffs had stipulated in the district court that they had suffered only foreign injuries; therefore, while the Court did not decide whether the alleged RICO injury was "foreign" or "domestic," it acknowledged that "application of this rule in any given case will not always be self-evident," and disputes over the location of an injury may arise in the future. *Id.* This is such a case.

Since *RJR Nabisco*, courts in this district have consistently held that determining the location of a RICO injury depends on where the plaintiff suffered the injury—not where the

---

[3] Civil proceedings enforcing RICO's substantive prohibitions may also be instituted by the Attorney General. 18 U.S.C § 1964(b).

9

injurious conduct took place. *See Dandong Old N.-E. Agric. & Animal Husbandry Co. v. Gary Ming Hu*, No. 15 Civ. 10015, 2017 WL 3328239, at *11 (S.D.N.Y. Aug. 3, 2017) ("[A] domestic injury is determined with reference to where the plaintiff feels the extent of the harm."); *City of Almaty, Kaz. v. Ablyazov*, 226 F. Supp. 3d 272, 282 (S.D.N.Y. 2016) ("[T]he appropriate subject of the inquiry required by *RJR Nabisco* is not the location of the Crossclaim Defendants' purportedly injurious conduct but the location where the injury itself arose."); *Bascuñan v. Elsaca*, No. 15 Civ. 2009, 2016 WL 5475998, at *5 (S.D.N.Y. Sept. 28, 2016) ("[T]he location where the *plaintiff suffered* the alleged injury dictates whether the plaintiff may pursue a private right of action under § 1964(c)."); *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 788–89 (S.D.N.Y. 2016) ("To determine whether this injury occurred domestically, the Court must determine where Plaintiffs parted with the journals at issue in this case."). This is consistent with the Supreme Court's decision in *RJR Nabisco*, which concluded that "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." 136 S. Ct. at 2108.

"Particularly after the Supreme Court's decision in *RJR Nabisco*, putative RICO violations are construed narrowly to adhere to the well-established presumption against extraterritoriality." *Dandong*, 2017 WL 3328239, at *11. In *Bascuñan*, the court framed the inquiry into whether an economic injury was suffered for purposes of Section 1964(c) by focusing on "where the economic impact of the injury was ultimately felt," and asking "two common-sense questions: (1) who became poorer, and (2) where did they become poorer." 2016 WL 5475998, at *4 (quoting *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12 Civ. 4025, 2013 WL 6667601, at *6–7 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks omitted)); *see also Ablyazov*, 226 F. Supp. 3d at 284 (endorsing the test

articulated in *Bascuñan* as consistent with the Supreme Court's focus in *RJR Nabisco* in assessing the extraterritoriality of § 1964(c) on injuries "suffered overseas"). "Determining the location where a putative *plaintiff suffered* an alleged injury . . . is an inquiry that is independent of the inquiry determining the location of a *defendant's conduct* to determine the applicability of § 1962's substantive prohibitions." *Bascuñan*, 2016 WL 5475998, at *5.[4]

Beginning with Plaintiffs' claims in the SAC, it is clear that the alleged injuries suffered by Plaintiffs were not suffered domestically. Yanchukov is a Russian businessman, and Unique Goals, Faith Union, and Mangazeya are all incorporated or registered in the British Virgin Islands. (SAC ¶¶ 8–11, 18–20.) Plaintiffs argue that they suffered a domestic injury due to the "losses suffered by the plaintiffs in the United States, including the funds processed through United States banks, the loss of domestic business and the inability to access American markets, the diversion of White Tiger funds by Finskiy, and his use of those funds to invest in the United States." (Dkt. No. 96 at 28.) However, Plaintiffs' allegations do not support a conclusion that Plaintiffs suffered an injury in the United States.

---

[4] Not every district court to consider *RJR Nabisco* has reached the same conclusion. In *Tatung Co., Ltd. v. Shu Tze Hsu*, the court declined to follow *Bascuñan*, reasoning that the plaintiff, a foreign corporation that "maintain[ed] a 'hub'" in the United States, had suffered a domestic injury when others engaged in a RICO conspiracy to prevent it from collecting an arbitration award issued and confirmed in California. 217 F. Supp. 3d 1138, 1153–57 (C.D. Cal. 2016). Like the court in *Ablyazov*, however, "[t]his Court agrees that the *Bascuñan* rule is consistent with the Supreme Court's focus in assessing the extraterritoriality of Section 1964(c) on injuries 'suffered overseas.'" 226 F. Supp. 3d at 284 (quoting *RJR Nabisco*, 136 S. Ct. at 2109).

The Court does not purport to adopt a categorical rule precluding any foreign corporation that does business in or maintains property interests in the United States from bringing a RICO action. To be sure, foreign corporations may experience domestic injury in the United States for purposes of § 1964(c). Here, however, Plaintiffs do not allege that they hold any domestic assets or maintain any operations in the United States. As discussed below, while Plaintiffs do allege that certain predicate acts, including board meetings of White Tiger, occurred in New York (SAC ¶¶ 92, 108, 137), such allegations are insufficient to support a conclusion that Plaintiffs suffered a domestic injury to business or property.

The fact that Finskiy conducted business in the United States, held White Tiger board meetings in the United States, and diverted the allegedly ill-gotten funds to the United States for his use (*see* Dkt. No. 96 at 27), is irrelevant to determining whether Plaintiffs suffered a domestic injury under the *Bascuñan* test. *See Ablyazov*, 226 F. Supp. 3d at 281 (rejecting "any suggestion that an alleged RICO injury may be deemed 'domestic' or 'foreign' purely by reference to the location of the predicate acts that purportedly caused it").

Moreover, it is of no moment that White Tiger (now Mangazeya) allegedly "has been impeded from accessing the United States capital markets, and has seen its business prospects in the United States severely diminished." (Dkt. No. 96 at 27 (citing SAC ¶ 158).) If reputational injury leading to loss of access to U.S. markets were sufficient to support a determination of domestic injury, the exception would swallow the rule: any company could demonstrate domestic injury by alleging a diminished capacity to participate in the markets of the United States.

Plaintiffs' allegations of domestic injury are based on the location of the predicate acts that led to the injury. Yet Plaintiff became poorer *outside* the United States. *Cf. Sack v. Low*, 478 F.2d 360, 365–66 (2d Cir. 1973) (concluding that "New York courts would follow [the] traditional approach" and recognize securities fraud claim as accruing "*where* the loss is suffered," which, in the fraud context, is where "its economic impact is felt, normally the plaintiff's residence").

Counter-Plaintiffs' allegations present a somewhat closer call, but nevertheless fail to allege domestic injury for purposes of maintaining their RICO counterclaims. Finskiy is a permanent resident of the United States and alleges that he managed the business and operations of Kirkland, DZM, and WTG (which included their ownership of White Tiger) from inside the

United States. (Counterclaim ¶¶ 15, 24–25.) Moreover, the alleged fraud occurred, in part, through meetings, phone calls, e-mails, and wires in the United States, including payments made through a bank in New York. (*Id.* ¶¶ 20, 36, 55–58, 60–61, 65, 87–90, 146–47.) Counter-Plaintiffs argue that the predicate acts of Counter-Defendants "have caused Kirkland, DZM, and [WTG] to lose their assets as a result of the sale of shares of White Tiger at an artificially low price," which "constitute[s] damages to their property." (Dkt. No. 114 at 14.) These injuries are domestic, Counter-Defendants argue, because "Finskiy operates his businesses out of the United States." (*Id.*)

First, as to the corporate entities, Counter-Plaintiffs fail to allege "a domestic injury to business or property," *RJR Nabisco*, 136 S. Ct. at 2111, suffered by Kirkland, DZM, Inger, or WTG. Kirkland, DZM, and Inger are incorporated in the British Virgin Islands, and WTG is incorporated in Luxembourg. (SAC ¶¶ 13–15.) Their only alleged connection to the United States is Finskiy. Counter-Plaintiffs urge the Court to conclude that these foreign corporations suffered a domestic injury because Finskiy managed the companies while in the United States. (Dkt. No. 114 at 14.)

In *Bascuñan*, the RICO claims arose out of a conspiracy to embezzle millions of dollars from a Chilean citizen. 2016 WL 5475998, at *1. There, "[t]he Defendants allegedly made . . . fraudulent transactions by causing the New York banks holding Plaintiffs' funds to wire money from Plaintiffs' accounts to Defendants' accounts located in New York and elsewhere" and removed stock certificates located in a New York safety deposit box. *Id.* at *2. In spite of this substantial domestic conduct, the *Bascuñan* court held that the economic loss alleged in the complaint constituted wholly "foreign" injury because the ultimate owner of the funds at issue "suffered the losses in Chile" by virtue of his residency and citizenship in that

13

country. *Id.* at *6. Here, too, though Finskiy may have engaged in domestic conduct, the economic loss to Kirkland, DZM, and WTG occurred abroad. The alleged forced sale of White Tiger led Kirkland, DZM, and WTG to "become poorer" outside of the United States. *Id.* at *4.

Counter-Plaintiffs provide no legal authority or rationale as to why the Court should conclude that the location of a manager of a foreign corporation is relevant to the question of where that corporation has been injured. (*See* Dkt. No. 128 at 9.) And, like the court in *Bascuñan*, this Court concludes that the alleged domestic activity is insufficient to establish domestic injury.

Second, Counter-Plaintiffs' argue that, personally, "Finskiy suffered damages in the United States because he lost stock, income, and salary from White Tiger" as a result of the coerced sale of White Tiger at the depressed price. (Dkt. No. 114 at 15.) Finskiy argues that he also suffered injury based on "the initiation of baseless criminal action . . . which in this case caused Finskiy, a United States permanent resident, damages in the United States." (*Id.*) "The relevant focus," Counter-Plaintiffs argue, "should be that the damages were caused to Finskiy, a United States permanent resident, in the United States." (*Id.*)

As to Finskiy's personal injuries, the Court concludes that they, too, are not domestic. As discussed, while some of the predicate acts that led to Finskiy's injuries took place in the United States—including the board meetings, phone calls, and e-mails that took place in or were directed to the United States—"[d]etermining the location where a putative *plaintiff suffered* an alleged injury . . . is an inquiry that is independent of the inquiry determining the location of a *defendant's conduct* to determine the applicability of § 1962's substantive prohibitions." *Bascuñan*, 2016 WL 5475998, at *5. The alleged wire transfers in the United States, including payments made through a bank in New York, are similarly insufficient to give rise to a domestic

14

injury to Finskiy. (Counterclaim ¶¶ 146–47.) "Because holding money in a New York bank account or conducting some financial operations in New York are relatively commonplace, standing alone, these bases are ordinarily insufficient to find that economic injury occurred in New York." *Bascuñan*, 2016 WL 5475998, at *4. Finskiy does not allege that business or property held in the United States was injured as a result of the coerced sale of White Tiger.

Finskiy's permanent residency is not relevant, moreover, because he acquired that status *after* the injury was sustained. As alleged in the Counterclaim to the SAC, the sale of White Tiger occurred in March 2013. (Counterclaim ¶¶ 84–97.) The alleged attempted extortion for $150,000,000 occurred in fall 2013. (*Id.* ¶ 105.) After the attempted extortion, "[f]or more than a year, Finskiy heard nothing from Yanchukov. Finskiy applied for permanent residency in the United States of America, and his application was approved for processing." (*Id.* ¶ 107.) Thus, the injury from the alleged coerced sale of White Tiger and the attempted extortion occurred *before* Finskiy was present in the United States.

While Finskiy was waiting for the issuance of his green card, Yanchukov and Victor Zolotov filed the criminal complaint against Finskiy in Russia in March 2014. (*Id.* ¶¶ 108–09.) The only injury that resulted from the filing of this criminal complaint occurred when Finskiy returned to Russia in March 2015. At that time, "he was immediately detained by agents of the Ministry of Internal Affairs and interrogated for three days." (*Id.* ¶ 110.) Indeed, "Ministry of Internal Affairs officers searched Finskiy's home in Moscow, his other real property in Russia, as well as his business offices, and seized numerous personal records, including all records that he maintained in Moscow relating to White Tiger." (*Id.* ¶ 117.) "[A]s a result of the baseless criminal complaint filed by Yanchukov in Russia, all of Finskiy's assets were seized by Internal Affairs under Viktor Zolotov's direction, including Finskiy's home in Moscow and all the

15

contents, his other real property in Russia, and all of his personal property, such as cars, files, computers, and other items." (*Id.* ¶ 123.) Finskiy was placed on house arrest with an ankle bracelet without access to internet or telephone. (*Id.* ¶ 120.) Ultimately, on advice of counsel, he fled to the United States by way of Belarus. (*Id.* ¶¶ 121–22.)

Although Finskiy was residing in the United States when the criminal complaint was filed, he did not experience any injury until he returned to Russia. Adopting a rule that foreign injuries become domestic injuries when the injured party applies for or receives legal status in the United States would make little sense and would be inconsistent with the Supreme Court's holding "that § 1964(c) does not overcome the presumption against extraterritoriality" and "[a] private RICO plaintiff . . . must allege and prove a domestic injury to its business or property." *RJR Nabisco*, 136 S. Ct. at 2106. That Finskiy chose to flee to the United States after injury in Russia does not support a conclusion that he suffered a domestic injury in the United States.

Accordingly, Plaintiffs'[5] and Counter-Plaintiffs' RICO claims are dismissed.

Plaintiffs' and Counter-Plaintiffs' remaining claims arise under state law.[6] Because all of the federal claims were dismissed, the Court declines to exercise supplemental jurisdiction over

---

[5] In their opposition brief, Plaintiffs seek leave to replead in the event that the Court dismisses any of the claims in the SAC. However, the Court is "not required . . . to provide[] detailed explanations when denying cursory or boilerplate requests for [leave to amend], made solely in a memorandum in opposition to a motion to dismiss." *Malin v. XL Capital, Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009). Nevertheless, the Court notes that the proposed Third Amended Complaint and SAC do not differ significantly with respect to the allegations of domestic injury. (*Compare, e.g.*, SAC ¶¶ 156–63, *with* Dkt. No. 97-1 ¶¶ 171–79.) Plaintiffs' request for leave to replead is therefore denied as futile.

[6] Counter-Plaintiffs allege that this Court has jurisdiction over its claims "pursuant to 28 U.S.C. § 1332(a)(2), because [they are] between a citizen and resident of the State of Florida and a citizen of a foreign state." (Counterclaim ¶ 10.) However, the presence of a foreign citizen opposite a foreign corporation "destroys complete diversity regardless of [the foreign citizen's] permanent residence status." *H.K. Huilin Int'l Trade Co., Ltd. v. Kevin Multiline Polymer Inc.,* 907 F. Supp. 2d 284, 289 (E.D.N.Y. 2012).

these non-federal claims. *See Oneida Indian Nation of N.Y. v. Madison Cty.*, 665 F. 3d 408, 436–37 (2d Cir. 2011) ("Although federal courts may exercise jurisdiction over related state-law claims . . . a court may . . . nonetheless 'decline to exercise supplemental jurisdiction over a claim' [where] . . . 'the district court has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C. § 1367(c))); *Valencia ex rel. Franco v. Lee*, 316 F. 3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))). Given the early stage of this litigation, the Court concludes that the *Cohill* factors support the decision to decline supplemental jurisdiction in this case.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss filed by defendants Finskiy, Kirkland, DZM, and WTG is GRANTED; the motion to dismiss filed by plaintiffs Yanchukov, Unique Goals, Faith Union, and Mangazeya is GRANTED; and the motion to dismiss filed by defendant Inger is GRANTED. All claims and counterclaims under the RICO statute are dismissed with prejudice. All state-law claims are dismissed without prejudice.

The pending motions relating to discovery disputes (Dkt. Nos. 136 & 137) are denied as moot.

The Clerk of Court is directed to close the motions at 77, 93, 126, 136, and 137 and to close the case.

Dated: August 14, 2017
       New York, New York

_____
J. PAUL OETKEN
United States District Judge